PEOPLE v SNIDER

Docket No. 203328. Submitted September 14, 1999, at Detroit. Decided
    January 14, 2000, at 9:00 A.M. Leave to appeal sought.

    Eric Snider was convicted by a jury in the Recorder's Court of
    Detroit, Robert L. Evans, J., of two counts of first-degree murder
    and one count of possession of a firearm during the commission of
    a felony and was sentenced to two mandatory terms of life impris-
    onment without parole for the murder convictions, to be served
    consecutively to the mandatory two-year prison term for the fel-
    ony-firearm conviction. The charges arose out of the shooting
    deaths of two persons in a parking lot adjacent to the Regency Inn,
    a transient's hotel. The first police officer arrived about five min-
    utes after the shootings and found one of the victims, Freddie
    Beatty, still alive. The officer was able to ascertain from Beatty that
    his assailant was named Eric and lived in the Regency Inn. The
    officer found the other victim dead in a nearby van, in which he
    found a spent red 12-gauge shotgun shell and some 12-gauge pel-
    lets. The officer then entered the hotel, ascertained that the only
    guest named Eric was Eric Snider, who was staying in room 412.
    The officer then returned to the parking lot and asked Beatty, who
    was being loaded into an ambulance, whether his assailant was
    Eric Snider, to which Beatty answered in the affirmative. The
    officer returned to the hotel, obtained the key to room 412, entered
    the room when his knocks on the door were unanswered, and,
    while in the room, saw a red 12-gauge shotgun shell under the bed
    and Snider's driver's license on a nightstand. A police officer was
    posted outside the room until a search warrant could be obtained.
    The room, still unoccupied, was searched, and the shotgun shell
    and Snider's driver's license were seized pursuant to the warrant. A
    few hours later, a hotel clerk informed the police that Snider had
    returned to his room. When the knocks by the police on Snider's
    door went unanswered and the key that the police had been given
    did not work, the police broke down the door, found Snider hold-
    ing a shotgun, disarmed him, seized the shotgun and five shotgun
    shells in Snider's possession, and arrested Snider. Subsequently,
    Snider, after being advised of his constitutional rights, gave a state-
    ment to the police in which he admitted shooting the two victims.

Before trial, Snider moved to suppress as evidence the items seized from his room and the statement given by him to the police. Both motions were denied by the trial court. Snider appealed.

The Court of Appeals *held*:

1. The officer's initial entry into Snider's room was proper under the exigent circumstances exception to the warrant requirement, because the officer had probable cause to believe that a crime had been committed and that Snider had been involved in that crime. The officer's entry into the room was justified on the bases of the need to prevent the destruction of any evidence, to protect the police and others, to prevent Snider's escape, or to determine whether Snider was wounded. Under the circumstances, the officer's entry and protective search of the room without a warrant was reasonable.

2. The trial court properly determined that the items seized following the search of the room pursuant to the search warrant did not have to be suppressed as evidence on the basis that the search pursuant to the warrant was tainted by the original search without a warrant. The warrant provided an independent basis for the second entry into and search of the room.

3. The entry by the police into Snider's room without first securing an arrest warrant was reasonable under the exigent circumstances existing at the time of the arrest. The police had probable cause to believe that Snider had committed the murders and that he might still be armed. Under the circumstances, the police were justified in believing that any delay in arresting Snider while obtaining an arrest warrant would be unreasonable in light of the danger that Snider posed to other guests of the hotel. The entry into the room to effect Snider's arrest without an arrest warrant was reasonable under the circumstances, and the seizure of the shotgun and shells was reasonable and proper as an incident of a lawful arrest.

4. Because the trial court properly found that the police had probable cause to arrest Snider in connection with the two murders on the basis of the information provided to them by one of the victims before he died, the trial court properly refused to suppress as evidence Snider's statement to the police on the basis that the statement was the fruit of an unlawful arrest.

5. The trial court was not clearly erroneous in its finding, after an evidentiary hearing, that the statement given to the police was voluntary.

6. The trial court did not abuse its discretion in permitting the introduction of testimony concerning Snider's prior contacts with the criminal justice system, because that testimony, under the cir-

cumstances, was a pertinent factor in the jury's weighing of the reliability of Snider's statement to the police. In any case, the admission of that testimony would not justify the reversal of the convictions in light of the weight and strength of the other evidence.

7. The question whether it was error to charge the jury pursuant to CJI2d 3.2 was not preserved for appellate review. In any event, the giving of the instruction regarding reasonable doubt that is contained in CJI2d 3.2 was not error, even though that instruction does not contain language requiring proof of guilt to a moral certainty.

8. The trial court did not abuse its discretion in denying Snider's motion to adjourn the trial for the purpose of securing any testimony the emergency room doctor who saw Beatty might give concerning whether blood and vomit in Beatty's throat would have precluded Beatty from making any statements to the police at the scene of the crime before being transported to the hospital. The court properly observed that any testimony by the doctor would, at best, be speculative. Snider has not demonstrated any prejudice resulting from the court's refusal to grant an adjournment.

9. The trial court denied Snider's request for a missing witness instruction with respect to an alleged eyewitness to the murders that the prosecution struck from its list of witnesses that it would produce at trial, finding that the prosecution had shown due diligence in attempting to locate and secure the attendance of the witness and, accordingly, that no missing witness instruction was required. Under MCL 767.40a; MSA 28.980(1), as amended by 1986 PA 46, the prosecution no longer has the duty to produce res gestae witnesses at trial; rather, the prosecution has the duty to provide notice to the defense of all res gestae witnesses that it intends to call and to give reasonable assistance in locating witnesses upon a defense request for such assistance. The trial court did not abuse its discretion in finding that the prosecution had used due diligence in attempting to locate the missing witness.

10. The record fails to support the claim that Snider was denied effective assistance of counsel at trial.

11. The life sentence without the possibility of parole that is required to be imposed upon conviction of first-degree murder does not violate Const 1963, art 4, § 45, which provides that the Legislature may provide for indeterminate sentences.

Affirmed.

1. CRIMINAL LAW — EVIDENCE — DEFENDANT'S PRIOR CONTACTS WITH CRIMINAL SYSTEM — CONFESSIONS.

Testimony concerning a defendant's prior contacts with the criminal justice system is admissible in a criminal trial where the testimony is a pertinent factor in the jury's weighing of the reliability of a statement given by the defendant to the police.

2. CRIMINAL LAW — CRIMINAL JURY INSTRUCTIONS — PROOF OF GUILT — MORAL CERTAINTY.

The giving of the instruction relating to reasonable doubt that is contained in CJI2d 3.2 is not error, even though that instruction does not contain language requiring proof of guilt to a moral certainty.

3. CRIMINAL LAW — RES GESTAE WITNESSES — DUTY OF THE PROSECUTION.

The prosecution no longer has the duty to produce res gestae witnesses at trial; rather, the prosecution has the duty to provide notice to the defense of all res gestae witnesses that it intends to call and to give reasonable assistance in locating and securing the attendance of other res gestae witnesses upon a defense request for assistance in securing such witnesses; where the prosecution has exercised due diligence in assisting to secure the attendance of such witnesses, a court may properly refuse to give a missing witness instruction (MCL 767.40a; MSA 28.980[1], as amended by 1986 PA 46).

4. CRIMINAL LAW — SENTENCES — INDETERMINATE SENTENCES — FIRST-DEGREE MURDER.

The life sentence without the possibility of parole that is required to be imposed upon conviction of first-degree murder does not violate the provision of the Michigan Constitution that the Legislature may provide for indeterminate sentences (Const 1963, art 4, § 45; MCL 750.316; MSA 28.548).

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, *Timothy A. Baughman,* Chief of Research, Training, and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

*Ashford & Associates* (by *Linda D. Ashford),* for the defendant on appeal.

Before: WHITBECK, P.J., and SAAD and HOEKSTRA, JJ.

WHITBECK, P.J.

## I. INTRODUCTION

This matter arises from the brutal, and apparently drug-related, shotgun slayings of two people near the Regency Inn in Detroit on the night of February 20, 1995. A jury convicted defendant Eric Snider of two counts of first-degree premeditated murder, MCL 750.316; MSA 28.548, with respect to these shooting deaths, as well as of possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Following the jury verdict, the trial court sentenced Snider to two mandatory terms of life imprisonment without parole for the first-degree premeditated murder convictions, to run consecutively to the mandatory two-year prison term for felony-firearm. Snider appeals as of right on a number of grounds, including one of first impression in Michigan: whether, after executing a search warrant and leaving a premises, the police may return to the premises and continue their search. We affirm.

## II. BASIC FACTS AND PROCEDURAL HISTORY

### A. THE SHOTGUN SLAYINGS

During trial, Ronald Rucks testified that at about 10:00 P.M. on February 20, 1995, he saw a white van pull into a parking lot near the Regency Inn in Detroit and that he then heard the victim, Freddie Beatty, "hollering for help," indicating that he had been shot. Rucks stated that he saw a person in black clothing, wearing a hooded jacket, running away from the van. Rucks said that he then approached Beatty, who asked him to call the police, and that the police arrived four or five minutes later. Rucks explained

that he knew Snider because Snider also lived at the Regency Inn, a transient hotel, and that Snider was about the same size as the person Rucks saw running away.

Detroit Police Sergeant Michael Passage testified that he arrived at the scene of the crime at about 10:17 P.M. and asked Beatty who shot him. Beatty answered "Eric." When Officer Passage asked for a last name, Beatty gave no reply. When Officer Passage asked Beatty what "Eric" was wearing, Beatty said a dark hooded jacket. According to Officer Passage, their conversation was not "flowing coherently" because Beatty was grimacing in pain from the gunshot wounds. When Officer Passage asked where "Eric" lived, Beatty stated "here," nodding "his head towards the hotel or motel." Officer Passage also testified that, about thirty feet away in the parking lot, he found a white Chevrolet van with both front doors open and the engine running. Inside the van was the body of a woman, Dannielle Collins, who was dead from a gunshot wound. Officer Passage recovered a spent red shotgun shell near the driver's front tire and some twelve-gauge pellets in the front seat.

### B. THE FIRST ENTRY INTO AND SEARCH OF ROOM 412

Officer Passage testified that he then entered the hotel and ascertained that Snider was the only "Eric" listed as a guest. Officer Passage stated that he then went back out to ask Beatty, as he was being placed into the ambulance, if the man who shot him was Eric Snider, and Beatty replied "yes." Officer Passage reentered the hotel, obtained a key for Snider's room, room 412, from the desk clerk, and went to that room. When no one responded to his knocks, Officer

Passage entered the room, but found no one present.
Officer Passage stated that he looked under the bed
and saw a red twelve-gauge shotgun shell that was
similar to the shotgun shell he had recovered near the
van. Officer Passage testified that he also saw
Snider's driver's license on the nightstand. Officer
Passage testified that he entered room 412 "[t]o see if
Eric Snider was in there to arrest him" and "to verify
that he had fled the scene." Officer Passage testified
that, after posting another officer outside the room,
he gave information to the Detroit Police Homicide
unit to obtain a search warrant for the room.
Returning once again to speak to Beatty, Officer Pas-
sage asked him if his assailant was Eric Snider, but
Officer Passage received no answer because "Beatty
"wasn't doing real well" because "[h]e was in a lot of
pain."

### C. THE SECOND ENTRY INTO, SEARCH OF, AND SEIZURE OF EVIDENCE IN ROOM 412

Later that night or in the early morning hours of
February 21, the Detroit police obtained a search war-
rant and made a second entry into room 412, which
was still unoccupied. The police then searched the
room and seized a twelve-gauge shotgun shell and
Snider's identification.

### D. THE THIRD ENTRY INTO, SEARCH OF, AND SEIZURE OF EVIDENCE IN ROOM 412

Detroit Police investigators testified that they told
the hotel staff to advise them when Snider returned
to his room. At about 4:00 A.M. on February 21, the
hotel clerk advised the police that Snider had

returned to his room. After obtaining a key from the hotel clerk, the police officers went to room 412, knocked and announced, "Police, would you open up." Although the police testified that they "heard somebody in there," there was no response, and an officer began to use the key. When the key did not work, the police officers kicked in the door. According to Detroit Police Officer Raymond Tandeski, the police were afraid that Snider might destroy evidence, might have blood from the scene or a weapon, might have property belonging to the complainant, or might barricade himself in the room. After breaking down the door, the police found Snider sitting on his bed with a shotgun pointed at them. The police ordered Snider to drop the shotgun, and he did so. The police then seized the shotgun and five shotgun shells they found in Snider's possession and arrested Snider.

### E. SNIDER'S CONFESSION

The Detroit police took Snider to police headquarters for questioning. Detroit Police Homicide investigator Steven Myles met with Snider at 5:45 A.M. on February 21, advised him of his rights, and had a brief conversation with him in which he denied his involvement in the fatal shootings. According to Snider, after he said that he did not want to make a statement, Officer Myles told him that he "was going to go to jail for murdering the two people they found at my apartment and they was [sic] going to do it one way or the other."

At about 9:30 A.M. on February 21, Detroit Police Homicide investigator Monica Childs met with Snider,

advised him of his rights, and talked with him. Snider indicated that he had completed an adult education program and that he had also attended Wayne State University. According to Officer Childs, Snider was coherent, his behavior was not abnormal or inappropriate, and he did not appear intoxicated. Snider admitted in his testimony that he understood his rights and that he had never asked to speak with a lawyer. Snider testified that he never indicated that he wanted to talk to Officer Childs, although she told him that he "was wanted for two homicides and that I was going to go to jail for it because they had evidence saying that I done [sic] it and either I was going to make a statement to her or she was going to make her own statement."

From roughly 10:00 A.M. to 2:15 P.M. on February 21, Officer Childs talked to Snider about some stolen property and his prior arrest record. At about 2:15 P.M., Snider gave a statement to Officer Childs. According to Snider, he agreed to make a statement because "we had been in there the whole day and she said she was going to make her statement or my statement and I said well it's better to be mine because I wanted to say what I felt on the statement." Snider also admitted that he did not tell Officer Childs that he did not want to talk any more. According to Snider, however, most of his statement was a "lie."

In his statement, Snider indicated that, although "Beatty wanted me dead for quite some time now," he arranged for a meeting with Beatty at about 10:00 P.M. in the parking lot to discuss a drug transaction. Snider further stated:

I got into the van with him [Beatty] and the female. Then after about three minutes of conversation, Freddy got out of the van and reached into the driver's side quarter panel. I shot him once and I shot the female once. I shot two times period.

Snider also stated that he used a twelve-gauge sawed-off shotgun for the shooting, "[T]he same one the police took from me last night." When asked what he was wearing at the time of the shootings, he stated:

The same clothes I got on now, black pants, black shirt, dark brown boots, dark green coat with a hood. No, I had on my black coat with the hood; and then after I shot them I came back when the police left and changed my coat when they arrested me.[1]

### F. THE VICTIMS' DEATHS

According to testimony at trial, Beatty died of a single shotgun blast that wounded the right arm and reentered into the right chest and then the abdomen, penetrating the liver and causing massive internal bleeding. The medical examiner opined that the shot was fired from approximately four to five feet away, although he could not determine the exact trajectory of the wound. The medical examiner opined that Beatty bled "internally profusely and rapidly and from that the death would be, I would estimate maybe as short as five or ten minutes, as long as more than half hour at the most." The medical examiner opined that,

---

[1] Snider also wrote in his own hand an acknowledgment that Officer Childs had offered to let him write his statement and that he was not denied food, medicine, restroom privileges, or water while he was in custody. When asked in his statement whether he had requested that an attorney be present before or during the questioning, he responded: "No. I made the statement by myself."

assuming that Beatty remained conscious, he would have been able to talk because there was no damage to his voice mechanism. According to the medical examiner, the internal bleeding would have caused the decedent's blood pressure to drop, which would have turned into shock and unconsciousness and eventually would have caused death, which would have occurred within a "time frame window [of] five or ten minutes to about half hour." There was testimony at trial that Collins died of a "through and through" shotgun wound to the left side of the back that went through her left lung.

### G. THE SUPPRESSION HEARING

In April of 1995, Snider moved to suppress the evidence seized incident to Snider's arrest. In an opinion and order dated July 14, 1995, the trial court denied the motion, apparently relying on a theory of "continuing probable cause" to justify the second search of room 412.

### H. THE *WALKER* HEARING

In May of 1995, the trial court held a *Walker* hearing, pursuant to *People v Walker (On Rehearing)*, 374 Mich 331, 338; 132 NW2d 87 (1965), regarding the voluntariness of Snider's confession. At the conclusion of the hearing, the trial court denied Snider's motion to suppress his confession.

### I. SNIDER'S PRIOR "CONTACTS WITH THE CRIMINAL JUSTICE SYSTEM"

At trial, Officer Childs testified, over a defense objection, that Snider had "contacts with the criminal

justice system" in March of 1989 and March of 1994. The trial court denied Snider's motion for a mistrial on the basis of that testimony, but did agree to provide a cautionary instruction to the jury. Officer Childs also testified on cross-examination, without any defense objection, that Snider had "two felony arrests" that were not "sex crimes or homicides," although she did not specifically know if they were armed robbery, but that at least one of them could have been for narcotics. Defense counsel requested a curative instruction that contacts with the criminal justice system did not necessarily mean convictions. The trial court gave a limiting instruction, directing the jury to consider the prior contacts for the purpose of determining Snider's state of mind during the police questioning while in custody, but declined to instruct the jury that contacts did not imply convictions.

### J. JURY INSTRUCTION REGARDING PROOF OF GUILT TO A "MORAL CERTAINTY"

At trial, the trial court gave a jury instruction that did not contain language concerning the concept of proof of guilt to a "moral certainty." Snider did not object to the trial court's jury instructions.

### K. REQUEST FOR AN ADJOURNMENT

At trial, the medical examiner testified on cross-examination that there was no apparent vomit or blockage in Beatty's airway when he examined Beatty at St. John's Hospital after Beatty died. To impeach

the medical examiner's testimony that Beatty's airway was not blocked, defense counsel read into the record the emergency room medical record indicating that there was vomit and blood in Beatty's airway. Snider also requested an adjournment to call the emergency room doctor to testify about the possible blockage of Beatty's airway. The trial court denied this request.

### L. "MISSING WITNESS" INSTRUCTION

At trial, a Regency Inn hotel clerk testified that a resident of the transient motel, Juttie Dew, gave her a description of the height and weight of the man running away from the scene of the homicides. Afterwards, Dew apparently gave a witness statement to the police. Because Dew appeared to be the only eyewitness to the homicides, Snider's trial counsel requested a due-diligence instruction concerning the prosecution's failure to produce Dew at trial. In response, the prosecutor argued that the prosecutor's office could not find Dew because he had no Michigan address, although he sometimes stayed with a cousin in Indiana, who also lived in Detroit. The prosecutor also claimed that, despite a background check in Michigan, Wisconsin, and Indiana, the prosecutor was unable to determine Dew's social security number or if he had a driver's license. The prosecutor's office also contacted Dew's ex-wife and eventually contacted Dew's brother, who reported that he did not know where his brother lived. The trial court denied the request for a "missing witness" instruction regarding Dew.

## M. INEFFECTIVE ASSISTANCE OF COUNSEL

At trial, Snider's counsel did not object to the repetition of Beatty's statements to the police immediately after the shooting that identified Snider as his assailant. Snider's counsel also did not object to the trial court's instructions on reasonable doubt and did not present medical evidence casting doubt on Beatty's continued ability to communicate with the police.

## III. THE SEARCHES OF ROOM 412 AND THE SEIZURE OF EVIDENCE

### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

Snider preserved the issue of the propriety of the searches of room 412 at the Regency Inn by moving before trial to suppress the evidence that the police seized from that room and from Snider. In considering a motion to suppress evidence, this Court reviews a trial court's factual findings to determine if they are clearly erroneous and reviews a trial court's conclusions of law de novo. MCR 2.613(C); *People v Faucett*, 442 Mich 153, 170; 499 NW2d 764 (1993).

### B. OVERVIEW

Both the United States and the Michigan Constitutions guarantee the right against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11; *In re Forfeiture of $176,598*, 443 Mich 261, 264-265; 505 NW2d 201 (1993). The lawfulness of a search or seizure depends on its reasonableness. *Vernonia School Dist v Acton*, 515 US 646, 652; 115 S Ct 2386; 132 L Ed 2d 564 (1995); *People v Orlando*, 305 Mich 686, 690; 9 NW2d 893 (1943); *People v Armendarez*, 188 Mich App 61, 66; 468 NW2d 893

(1991). "Generally, a search conducted without a warrant is unreasonable unless there exist both probable cause and a circumstance establishing an exception to the warrant requirement." *People v Mayes (After Remand)*, 202 Mich App 181, 184; 508 NW2d 161 (1993). Probable cause requires a " ' "substantial basis for . . . [concluding]" that a search would uncover evidence of wrongdoing.' " *People v Garvin*, 235 Mich App 90, 102; 597 NW2d 194 (1999), quoting *Illinois v Gates*, 462 US 213, 236; 103 S Ct 2317; 76 L Ed 2d 527 (1983). For probable cause to exist, there must be " 'a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Garvin, supra* at 102, quoting *Gates, supra* at 238. However, a finding of probable cause does *not* require that "it is more likely than not that a search will turn up the type of item suspected." *Garvin, supra* at 104. In *People v Davis*, 442 Mich 1, 10; 497 NW2d 910 (1993), the Court observed that "exigent circumstances" represents an exception to the warrant requirement. The *Davis* Court also recognized that an occupant of an hotel or motel room is entitled to the Fourth Amendment protection against unreasonable searches and seizures. *Id.*

### C. THE FIRST ENTRY INTO AND SEARCH OF ROOM 412

Snider claims that the trial court erred in failing to suppress the evidence seized because Officer Passage first entered room 412 immediately after the shootings without a warrant and without exigent circumstances. We disagree and find that Officer Passage's entry into and search of room 412 without a warrant did not constitute an unreasonable search in violation of the Fourth Amendment because that search was

justified under the exigent circumstances exception to the warrant requirement and was reasonable as a protective search.

In *In re Forfeiture of $176,598, supra* at 271, the Michigan Supreme Court considered the exigent circumstances exception to the general warrant requirement of the Fourth Amendment:

> Pursuant to the exigent circumstances exception, we hold that the police may enter a dwelling without a warrant if the officers possess probable cause to believe that a crime was recently committed on the premises, and probable cause to believe that the premises contain evidence or perpetrators of the suspected crime. The police must further establish the existence of an actual emergency on the basis of specific and objective facts indicating that immediate action is necessary to (1) prevent the imminent destruction of evidence, (2) protect the police officers or others, or (3) prevent the escape of a suspect. If the police discover evidence of a crime following the entry without a warrant, that evidence may be admissible.

As pointed out by the Court in *People v Blasius*, 435 Mich 573, 583; 459 NW2d 906 (1990), "the risk of destruction or removal of evidence may constitute an exigent circumstance exception to the warrant requirement." The *Blasius* Court, after observing that the "precise contours of the exigent circumstances exception remain hazy," *id.*, stated that " '[o]ur decisions have recognized that a warrantless entry by criminal law enforcement officials may be legal where there is compelling need for official action and no time to secure a warrant,' " *id.*, n 7, quoting *Michigan v Tyler*, 436 US 499, 509; 98 S Ct 1942; 56 L Ed 2d 486 (1978). See also *People v Williams*, 160 Mich App 656, 664-665; 408 NW2d 415 (1987), where this Court

found that there were exigent circumstances justifying the police entry into the defendant's home if the police officers were not in a position to secure the premises and to wait for the issuance of a warrant without putting themselves at risk or running the risk that the crime in progress might continue.

In *People v Cartwright*, 454 Mich 550, 559; 563 NW2d 208 (1997), the Michigan Supreme Court, reversing the judgment of this Court, found that the evidence seized in the search should not have been suppressed because the police entry and protective search of the defendant's mobile home was not unreasonable and, thus, did not violate the Fourth Amendment. There, the police, flying over the defendant's property, saw marijuana plants near a mobile home and shed. *Id.* at 551-552. The police also observed the defendant enter the pertinent residence and later leave with several children. *Id.* at 552. Thereafter, a police officer entered the residence for less than one minute to make certain that no one was on the premises, and while in the residence he observed marijuana and firearms, but did not confiscate anything. *Id.* at 552-553. Subsequently, the police obtained a search warrant and confiscated numerous marijuana plants and firearms. *Id.* at 553. The Court, citing *People v Olajos*, 397 Mich 629, 634; 246 NW2d 828 (1976), noted "the validity of an entry for a protective search without a warrant depends on the reasonableness of the response, *as perceived by police.*" *Cartwright, supra* at 559. The Court then found that "the governmental interest in ensuring that the investigating officers were not at risk outweighed the minimal intrusion that occurred." *Id.* at 561. The Court also noted that the brief entry into the residence did not

constitute a full search, "but rather a cursory inspection of areas where a person presenting a danger to officers might be found," and that the search "lasted no longer than necessary 'to dispel the reasonable suspicion of danger.' " *Id.* at 562 (citation omitted).[2]

Here, we find that Officer Passage's initial entry into room 412 without a warrant was justified under the exigent circumstances exception to the warrant requirement because he had probable cause to believe that a crime had just been committed and had justification for a search of the room to prevent the destruction of any evidence, to protect the police or others, to prevent Snider's escape, or to determine if Snider were wounded. Officer Passage arrived at the scene of the crime within minutes of the shooting and learned from Beatty as he lay dying the identity and place of residence of the person who had shot him. Once Officer Passage learned Snider's room number, he obtained Snider's room key to gain access to room 412. Officer Passage could not wait for the issuance of a warrant without running a substantial risk that evidence might be destroyed, that Snider might pres-

---

[2] See also *Mincey v Arizona*, 437 US 385, 392-393; 98 S Ct 2408; 57 L Ed 2d 290 (1978), where the United States Supreme Court noted that there may be justification for application of the exigent circumstances exception to the warrant requirement when police make a prompt search without a warrant of the area around a murder scene to see if there are other victims or if a killer is still on the premises for the purpose of protecting or preserving life or avoiding serious injury. However, in *Mincey*, the United States Supreme Court invalidated a four-day search of a murder scene where hundreds of objects were seized. The Court reasoned that the search violated the Fourth and Fourteenth Amendments and was not justifiable simply because a homicide recently occurred at the scene of the search or because the police officers may have begun their search promptly and may have searched only for evidence establishing the circumstances pertaining to the murder.

ent a danger to the police or others, or that Snyder might be wounded. *Williams, supra* at 662.

We also find that Officer Passage's initial search of room 412 without a warrant was reasonable as a protective search of Snider's room. Officer Passage made a nonforceful entry to determine whether Snider was present, whether he was wounded, or whether there was any evidence to preserve. Here, Officer Passage's brief entry into room 412 was outweighed by the governmental interest in ensuring that the police or others were not at risk. *Cartwright, supra.* Viewed from the standpoint of Officer Passage, the protective search of room 412 was reasonable. *Id.* at 559. Accordingly, we hold that there were sufficient facts showing exigent circumstances to justify Officer Passage's first entry into and search of room 412 immediately after the shootings and that the trial court did not err in denying the motion to suppress evidence on this ground.

### D. THE SECOND ENTRY INTO, SEARCH OF, AND SEIZURE OF EVIDENCE IN ROOM 412

Snider claims that the trial court erred in failing to suppress the evidence that the Detroit police seized during the second entry into room 412 because that search and seizure, although conducted under the authority of a search warrant, was tainted by the original illegal search. We again disagree and find that the police entry into, search of, and seizure of evidence in room 412 was a reasonable search and seizure for the purpose of the Fourth Amendment. It is clear that the search warrant provided an independent basis for the second entry into and search of room 412 and an

independent source for the discovery and seizure of the evidence in question. *People v Smith*, 191 Mich App 644, 648-649; 478 NW2d 741 (1991). We hold that the trial court did not err in denying the motion to suppress evidence on this ground.

### E. THE THIRD ENTRY INTO, SEARCH OF, AND SEIZURE OF EVIDENCE IN ROOM 412

#### (1) A SINGLE WARRANT AND A SINGLE SEARCH

Snider claims that the trial court erred in failing to suppress the evidence that the Detroit police seized during the third entry into room 412 because that search and seizure was illegal as a violation of the general rule that a single search warrant authorizes a single search. See *McDonald v State*, 195 Tenn 282, 284; 259 SW2d 524 (1953) ("a second search of the premises under a search warrant that has already been once served with reference to those premises is an unreasonable search"); see also 2 LaFave, Search and Seizure (1996 ed), § 4.10(d), pp 678-680. While we consider this argument to be an interesting one, we conclude that we need not address it because we find that there were grounds *independent* of the search warrant that justified the third entry into, search of, and seizure of evidence in room 412.

#### (2) INDEPENDENT BASIS FOR THE THIRD ENTRY, SEARCH, AND SEIZURE OF EVIDENCE

We note that at the suppression hearing, the police officers testified that they believed that the lives of other hotel guests were in danger by the presence of Snider, whom they suspected of murdering Beatty and Collins by shooting them at close range with a

shotgun. Also, the police wanted to avoid a barricaded gunman situation, to prevent the destruction of evidence, and to protect their own lives.

Clearly, the police officers possessed probable cause at the time of the third entry to believe that Snider recently committed a crime and probable cause to believe that Snider was in room 412 and possessed evidence of that crime. Further, there were specific and objective facts indicating that immediate action was necessary to (1) prevent the imminent destruction of evidence, (2) protect the police officers or others, or (3) prevent the escape of a suspect. *In re Forfeiture of $176,598, supra* at 271. We believe, therefore, that there were exigent circumstances, on search and seizure grounds, justifying the third entry into room 412 and the ensuing search of the room and seizure of evidence *independent* of the search warrant.

Furthermore, we believe that there were exigent circumstances allowing the police to enter Snider's motel room without an *arrest* warrant to arrest him *and* to seize the evidence related to the murders. We note that if the police had obtained a warrant for Snider's arrest before the third entry, search, and seizure, there would have been no question regarding the justification for their third entry into room 412. The question, when viewed from this perspective, therefore becomes whether the arrest of Snider by the police without a warrant was justified on the grounds of exigent circumstances *relating to the arrest.*

We recognize that it is well established that an arrest of a defendant without a warrant in his private residence is illegal unless the circumstances sur-

rounding that arrest are exigent. *Payton v New York*, 445 US 573, 589; 100 S Ct 1371; 63 L Ed 2d 639 (1980); *People v Parker*, 417 Mich 556, 561; 339 NW2d 455 (1983). In *Parker*, the Court observed:

> The essence of the exigency which would excuse the failure to obtain a warrant is the existence of circumstances known to the police which would prevent them from taking the time to obtain a warrant because to do so would thwart the arrest. [*Id.* at 561.]

Here, the police were justified in concluding that Snider's armed presence in the hotel endangered the lives of the other guests. Further, the police were justified in concluding that any delay in arresting Snider while obtaining an arrest warrant would be unreasonable in light of the danger that Snider posed to the other guests.[3] Therefore, we find that there were exigent circumstances known to the police that excused them from taking the time to obtain an arrest warrant. The police were confronted with what can only be classified as an emergency situation: a murder suspect, who they had every reason to believe was armed, located in a hotel room under circumstances that very probably might put the lives and safety of the others at risk. Indeed, when the police broke down the door to room 412, they found Snider sitting on his bed with a shotgun pointed at them. As noted below, we hold that the trial court properly found that the police had probable cause to arrest Snider. If

---

[3] We note that the prosecutor made these arguments in response to Snider's motion to suppress but that the trial court did not address this argument in its opinion and order.

this is so, then the third entry into room 412 and the ensuing search of the room and seizure of evidence was also justified on this second ground, which is also *independent* of the search warrant

### (3) CONCLUSION

We need not decide whether the third entry into, search of, and seizure of evidence in room 412 by the police was authorized by the search warrant that they obtained in connection with the second entry, search, and seizure. We do so because authority for the third entry, search, and seizure existed on grounds *independent* of the authority of the search warrant. We conclude that the third entry, search, and seizure were justified on exigent circumstances relating both to the search and seizure of evidence and to Snider's arrest. With respect to the first ground, we conclude that the police possessed probable cause to believe that Snider recently committed a crime, to believe that he was in room 412, and to believe that he possessed evidence of that crime. With respect to the second ground, we conclude that exigent circumstances known to the police excused them from taking the time to obtain an arrest warrant and, therefore, that the entry into, search of, and seizure of evidence in room 412 were justified by being made pursuant to a legitimate arrest without a warrant.

### F. SNIDER'S STATEMENTS AS THE FRUITS OF AN UNLAWFUL ARREST

Snider contends that his statements to the police after his arrest should have been excluded as the

fruits of an unlawful arrest, "even if an accused was given *Miranda* warnings and even if the statement is otherwise voluntary." We disagree. Even if we assume for the purpose of this argument that Snider's arrest was illegal[4] because the police entered room 412 without an arrest warrant and without his consent, we would note that this Court in *People v Dowdy*, 211 Mich App 562, 570; 536 NW2d 794 (1995), adopting the rationale set forth in *New York v Harris*, 495 US 14, 17-18; 110 S Ct 1640; 109 L Ed 2d 13 (1990), observed that "the exclusionary rule was not intended to grant criminal suspects protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime."

We hold that the trial court properly found that the police had probable cause to arrest Snider in connection with the two homicides on the basis of the information provided them by Beatty as he died. Further, even if Snider's arrest was not supported by probable cause, we hold that the trial court properly refused to suppress his statement to the police as the fruit of an illegal arrest because his confession was " 'sufficiently an act of free will to purge the primary taint.' " *Brown v Illinois*, 422 US 590, 602; 95 S Ct 2254; 45 L Ed 2d 416 (1975), quoting *Wong Sun v United States*, 371 US 471, 486; 83 S Ct 407; 9 L Ed 2d 441 (1963); *People v Mallory*, 421 Mich 229, 243, n 8; 365 NW2d 673 (1984). We therefore hold that the trial court did not err in denying the motion to suppress Snider's statements to the police on this ground.

---

[4] We conclude to the contrary in the previous section and below.

## IV. SNIDER'S CONFESSION

### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

Snider preserved the issue of the voluntariness of his confession by filing a pretrial motion to suppress that confession. Whether a defendant's statement was knowing, intelligent, and voluntary is a question of law that a court must determine under the totality of the circumstances. *People v Cheatham*, 453 Mich 1, 27 (BOYLE, J.), 44 (WEAVER, J.); 551 NW2d 355 (1996); *People v Etheridge*, 196 Mich App 43, 57; 492 NW2d 490 (1992). Because this Court gives ample deference to the trial court, it will not reverse the trial court's findings unless they are clearly erroneous. *People v Mack*, 190 Mich App 7, 17; 475 NW2d 830 (1991).

### B. OVERVIEW

Snider claims that the trial court clearly erred in finding that his confession was voluntary where he was arrested, held overnight, and then questioned throughout the next day. In general, statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his Fifth Amendment rights. *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). In *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988), the Michigan Supreme Court set forth the following nonexhaustive list of factors that a trial court should consider in determining whether a statement is voluntary:

the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the question-

ing; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

### C. THE TRIAL COURT'S FINDINGS

Here, at the conclusion of the *Walker* hearing, the trial court stated:

> Thus, I would be prepared to hold if that [Snider's detention status] were the only consideration here that even if the detention status of defendant were questionable because of the place in which he was seized, that I'm nonetheless persuaded that the defendant's statement was voluntary. I believe Officer Childs' testimony concerning her day long interview with defendant and I have no doubt that the defendant chose as he said to make a statement because in doing so he could better insure the accuracy of what was put down, but I don't believe that the defendant was coerced and I don't believe that the moving factor in his statement was any more than his eventual determination that making a statement was in his best interest and I find it was voluntary.

Giving due deference to the trial court's findings, especially because the demeanor of witnesses and credibility are so vitally important to a trial court's determination, we hold that there is no basis for overturning the trial court's finding of voluntariness because we cannot say that the trial court's factual findings were clearly erroneous.

### V. SNIDER'S "PRIOR CONTACTS WITH THE CRIMINAL JUSTICE SYSTEM"

#### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

Snider objected to the prosecutor's introduction into evidence of testimony concerning Snider's prior felony arrests and also moved for a mistrial, which the trial court denied. Snider therefore preserved this issue. The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). An abuse of discretion is found only if an unprejudiced person, considering the facts on which the trial court acted, would say there was no justification or excuse for the ruling made. *People v McAlister*, 203 Mich App 495, 505; 513 NW2d 431 (1994).

#### B. OFFICER CHILDS' TESTIMONY

Snider claims that the trial court committed error requiring reversal when it allowed the prosecutor, through Officer Childs, to introduce evidence of Snider's "prior contacts with the criminal justice system," because the voluntariness of Snider's statements was not an issue for the jury. We disagree. We find that the trial court did not abuse its discretion in allowing Officer Childs' testimony because the circumstances surrounding a confession, including a suspect's prior contacts with the police, is a pertinent factor to put before the jury in its weighing of the reliability of a defendant's statement to the police. *People v Anglin*, 111 Mich App 268, 290; 314 NW2d 581 (1981). In any case, any error in the admission of this evidence does not justify reversal in light of the

weight and strength of the untainted evidence. *People v Lukity*, 460 Mich 484, 491-496; 596 NW2d 607 (1999).

## VI. JURY INSTRUCTION REGARDING PROOF OF GUILT TO A "MORAL CERTAINTY"

### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

Snider waived review of jury instructions by failing to object at trial. *People v Taylor*, 159 Mich App 468, 488; 406 NW2d 859 (1987). Therefore, Snider did not preserve the issue whether the trial court erred by not including an instruction concerning proof of Snider's guilt to a "moral certainty." This Court reviews unpreserved claims of constitutional error for plain error that affected substantial rights. *People v Carines*, 460 Mich 750, 761-764, 774; 597 NW2d 130 (1999). A "reviewing court should reverse only if the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 774. In this case, there was no plain error that affected Snider's substantial rights.

### B. CJI2D 3.2 AND *PEOPLE V SAMMONS*

However, we would find no error requiring reversal even if this issue were preserved. Snider claims that the trial court committed error requiring reversal by leaving out the concept of "moral certainty" in its reasonable doubt instruction. We disagree. We find Snider's claim with respect to this issue to be without merit. A trial court commits no error in giving CJI2d 3.2, which does not contain language expressly requir-

ing proof of guilt to a moral certainty. *People v Sammons*, 191 Mich App 351, 372; 478 NW2d 901 (1991).

### VII. REQUEST FOR AN ADJOURNMENT

#### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

Snider preserved the issue whether the trial court erred in refusing to adjourn the trial to enable Snider to obtain testimony concerning blood or vomit in Beatty's airway by moving for an adjournment. This Court reviews the grant or denial of an adjournment for an abuse of discretion. *People v Peña*, 224 Mich App 650, 660; 569 NW2d 871 (1997), mod on other grounds 457 Mich 885 (1998). In addition, a defendant must show prejudice as a result of the trial court's abuse of discretion. *Id.* at 661.

#### B. DEMONSTRATION OF PREJUDICE

Snider claims that the trial court abused its discretion by refusing to adjourn the trial so that Snider could obtain testimony concerning blood or vomit in Beatty's airway. We disagree. We find that the trial court did not abuse its discretion by denying Snider's request for an adjournment. After the medical examiner testified on cross-examination that there was no apparent vomit or blockage in Beatty's airway, Snider requested an adjournment to call the emergency room doctor to testify about the possible blockage of Beatty's airway. Making a separate record, the trial court denied Snider's request for a continuance, noting that "I can't grasp how the doctor could do more than speculate about those matters" and that "the interest of moving this case forward outweighs any further delay." We hold that Snider has failed to

demonstrate any prejudice as a result of the action. *Peña, supra* at 661. As the prosecutor points out, "Defendant has been unable to show how the [emergency room] doctor's testimony would have been helpful in any way—particularly since Snider himself admitted shooting both victims."

### VIII. "MISSING WITNESS" INSTRUCTION

#### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

Snider raised the issue of a "missing witness" instruction below, thus preserving the matter for appellate review. This Court reviews a trial court's denial of a request for a "missing witness" instruction for an abuse of discretion. *People v Burwick*, 450 Mich 281, 298; 537 NW2d 813 (1995).

#### B. THE AMENDMENT OF MCL 767.40A; MSA 28.980(1)

Snider claims that the trial court erred in denying his request for a "missing witness" instruction because he was convicted on evidence that did not include the testimony of the alleged only eyewitness, Juttie Dew, to the crime, whom the prosecutor failed to produce because of a lack of due diligence. We disagree.

In denying Snider's request for a "missing witness" instruction with respect to Dew, the trial court found that the prosecutor had shown due diligence and thus the missing witness instruction was unnecessary. We find that the prosecution showed good cause to strike Dew from its list when it was unable to locate him. Before the amendment of MCL 767.40a; MSA 28.980(1), the prosecutor was required to exercise due diligence to produce an individual who might

have any knowledge of the crime. The amendment of MCL 767.40a; MSA 28.980(1), 1986 PA 46, imposes a continuing duty on the prosecutor to advise the defense of all res gestae witnesses that the prosecutor intends to produce at trial. Put in other terms, the prosecutor's duty to produce res gestae witnesses was replaced with the duty to provide notice of known witnesses and to give reasonable assistance in the locating of witnesses if a defendant requests such assistance. *Burwick, supra* at 290-291. Accordingly, the prosecutor had no duty to produce Dew, especially because the prosecutor could not find him after exercising due diligence. The prosecutor was therefore free to strike Dew from the witness list. We hold that the trial court did not abuse its discretion in denying Snider's request to give a "missing witness" instruction.

### IX. INEFFECTIVE ASSISTANCE OF COUNSEL

#### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

A claim of ineffective assistance of counsel should be raised by a motion for a new trial or an evidentiary hearing. *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973). Here, Snider took no steps to develop a testimonial record in support of his claim that his trial counsel was ineffective and has therefore largely forfeited it. *People v Dixon*, 217 Mich App 400, 408; 552 NW2d 663 (1996). Thus, review is limited to the existing record. *Armendarez, supra* at 74. The standard for determining whether a defendant was denied the effective assistance of counsel was explained by the Michigan Supreme Court in *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994). To

establish a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that there is a reasonable probability that, but for the deficiency, the factfinder would not have convicted the defendant. *Id.* at 312.

### B. HEARSAY TESTIMONY

Snider claims that he was denied the effective assistance of counsel when his trial counsel did not object to the testimony of Officer Passage about Beatty's statements to him, immediately after the shooting, that identified Snider as Beatty' assailant. We disagree. Although Snider claims that the victim's statement was hearsay under MRE 801, the prosecutor correctly points out that Beatty's statement likely qualified as a dying declaration under MRE 804(b)(2), *People v Siler*, 171 Mich App 246, 251; 429 NW2d 865 (1988), or as an excited utterance under MRE 803(2), *People v Kowalak (On Remand)*, 215 Mich App 554, 557-559; 546 NW2d 681 (1996). We hold that trial counsel did not render ineffective assistance when he did not object to the admission of Beatty's statements to Officer Passage.

### C. INSTRUCTIONS CONCERNING REASONABLE DOUBT

Snider claims that he was denied the effective assistance of counsel when his trial counsel failed to object to "improper" instructions and to seek "proper" instructions concerning reasonable doubt. Here, Snider incorporates his previous argument that it was error for the trial court not to include within its instructions an instruction regarding proof to a "moral certainty." Above, we have held this argument

to be without merit. It is similarly without merit to impute error to Snider's trial counsel for failure to object to the trial court's instructions when the instructions themselves were not erroneous. Trial counsel is not required to advocate a meritless position. *People v Rodriguez*, 212 Mich App 351, 356; 538 NW2d 42 (1995).

### D. MEDICAL EVIDENCE

Snider contends that his trial counsel was ineffective because he failed to present medical evidence casting doubt on Beatty's continued ability to communicate with the police and failed to impeach the medical examiner with regard to the issue whether the presence of blood or vomit in Beatty's airway could have interfered with Beatty's ability to speak. The trial court correctly recognized that the emergency room physician could only have speculated whether Beatty's airway was blocked at the time he spoke to the police. We hold that trial counsel did not render ineffective assistance under these circumstances. *Pickens, supra.*[5]

### X. SENTENCING

#### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

We assume without deciding that the sentencing issue at hand, involving the constitutionality of determinate sentencing, did not need to be preserved for review below. As a question of law, we review this issue de novo. *Faucett, supra.*

---

[5] In any event, Snider has failed to show prejudice because he, in fact, admitted in his statement to the police that he shot the victims.

B. MCL 769.9(1); MSA 28.1081(1)

Without directly mentioning the relevant statute, Snider claims that a mandatory life sentence without the possibility of parole, such as that imposed by the trial court, is a determinate sentence "violating the indeterminate-sentence principle of Article 4, § 45 of the Michigan Constitution." In MCL 769.9(1); MSA 28.1081(1), the Legislature determined that the provisions of the indeterminate sentencing statute shall not apply to mandatory life offenses. Snider's real challenge, therefore, is to that legislative determination.

C. CONST 1963, ART 4, § 45 AND *PEOPLE V COOPER*

Const 1963, art 4, § 45 provides:

> The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences.

In the recent case of *People v Cooper*, 236 Mich App 643, 660-664; 601 NW2d 409 (1999), this Court had the occasion to interpret this provision as it related to a determinate sentence, in that case the two-year determinate sentence for felony-firearm, MCL 750.227b; MSA 28.424(2). We observed that while the constitutional provision "plainly authorizes indeterminate sentencing, it includes no *prohibition* against a statute *requiring* determinate sentencing as a punishment for crime." *Id.* at 661. The same analysis applies here; there is nothing in Const 1963, art 4, § 45 requiring indeterminate sentencing for particular crimes, such

as Snider's first-degree premeditated murders. As we said in *Cooper:*

> Moreover, the history underlying Const 1963, art 4, § 45 does not support a conclusion that it bars determinate sentencing. In *People v Cummings*, 88 Mich 249; 50 NW 310 (1891), the Michigan Supreme Court held that an indeterminate sentence act adopted on July 1, 1889, was unconstitutional, in essence because it violated the separation of powers. Thereafter, a constitutional amendment to the Michigan Constitution of 1850 was adopted at an election in November 1902 with language substantively identical to Const 1963, art 4, § 45 that authorized the Legislature to provide for indeterminate sentences. See *In re Campbell*, 138 Mich 597, 601-602; 101 NW 826 (1904). Similarly, a provision, substantively identical to Const 1963, art 4, § 45, expressly authorizing the Legislature to provide for indeterminate sentencing was included in the Michigan Constitution of 1908, which was in force between the 1850 Constitution and the present Michigan Constitution. Const 1908, art 5, § 28.
>
> In light of this historical background, the Legislature was recognized as having the power to provide for determinate sentences as punishment for crime before the inclusion of a provision in a prior state constitution allowing the Legislature to provide for indeterminate sentencing. The initial inclusion of such a constitutional provision was a response to the holding in *Cummings* that indeterminate sentencing was unconstitutional. Thus, Const 1963, art 4, § 45 reflects an *expansion* of legislative power to include the power to provide for indeterminate sentences for crimes, not a *removal of* the previously existing power to provide for determinate sentences. Moreover, we take notice that since the adoption of the first state constitutional provision allowing indeterminate sentencing, the Legislature has enacted numerous statutes allowing imposition of determinate sentences as punishment for crimes, particularly for misdemeanors that might be punished with a term of days in jail. This reflects that the drafters of Const 1963, art 4, § 45, and its preceding analogous constitutional provisions,

did not intend to bar determinate sentencing. [*Cooper, supra* at 661-662.]

The same reasoning applies to Snider's implied assertion that MCL 769.9(1); MSA 28.1081(1) is unconstitutional. We hold that it is not unconstitutional, under the binding precedent of *Cooper*.

### XI. CONCLUSION

We hold that the trial court did not err in denying Snider's motion to suppress the evidence obtained in the searches of room 412. In particular, we hold that the third entry into, search of, and seizure of evidence in room 412 was justified by exigent circumstances relating *both* to search and seizure of evidence *and* to Snider's arrest. We further hold that (1) the trial court did not err in finding Snider's confession to be voluntary; (2) the trial court did not abuse its discretion in permitting the prosecutor to introduce evidence of Snider's "prior contacts with the criminal justice system" for the purpose of demonstrating Snider's familiarity with that system and that there is no merit to Snider's claim that Officer Childs' testimony about such contacts denied him a fair trial; (3) the trial court committed no error in giving CJI2d 3.2, which does not contain language requiring proof of guilt to a "moral certainty;" (4) the trial court did not abuse its discretion by denying Snider's request for an adjournment because Snider demonstrated no prejudice as a result of that denial; (5) the trial court did not abuse its discretion when it denied Snider's request to give a "missing witness" instruction; (6) Snider was not denied the effective assistance of counsel; and (7) there is no merit to Snider's implied assertion that

MCL 769.9(1);  MSA 28.1081(1) is unconstitutional.[6] Accordingly, we affirm.

---

[6] Snider also asserts that the "cumulative effect of those [i.e., his previously asserted] errors was so prejudicial as to deny a fair trial." Because we have found no errors, there obviously can be no improper cumulative effect.