# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DASHEAN KEITH WILLIAMS,

        Defendant-Appellant.

UNPUBLISHED
July 12, 2016

No. 326093
Wayne Circuit Court
LC No. 14-007612-FC

Before: JANSEN, P.J., and FORT HOOD and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his convictions, following a jury trial, of first-degree premeditated murder, MCL 750.316, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced him to life imprisonment without parole for the first-degree murder conviction and two years' imprisonment for the felony-firearm conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of the fatal shooting of the victim, Richarde Scarborough in the parking lot of an apartment building in Detroit on June 23, 2014. Dontez Abram, who was 16 years old at the time of trial, testified that he was in the parking lot of the Jefferson Square apartment complex at approximately 11:00 p.m. Scarborough, known as "Doughboy," was sitting in a car in the parking lot. At some point, Dontez heard gunshots. Upon hearing the gunshots, he ran down the street to meet up with his brother, Dioneta Abram. Two days after the shooting, Dontez told the police that he had seen defendant shoot Scarborough, and he identified defendant in a photographic lineup. Dontez had known defendant as a friend for five or six years at the time of the shooting.

At trial, Dontez initially testified that he did not see defendant at the scene of the shooting. However, after the trial judge advised Dontez, outside the presence of the jury, regarding the penalty for perjury, Dontez testified that, before he ran, he saw defendant shooting a handgun into the car where Scarborough was sitting. The shooting occurred about eight to ten feet away from where Dontez was standing. Dontez testified that his brother, Dioneta Abram, and Shajuan Hicks were in the car with Scarborough at the time of the shooting, but that Dioneta "hopped out the car and ran off" when the shooting began. Dontez acknowledged that he told

-1-

the prosecutor, on July 3, 2014, that he saw defendant shoot Scarborough, and that he testified at the preliminary examination that he saw defendant shoot Scarborough. On cross-examination, Dontez admitted that, on the day before trial, he told defense counsel that he did not see defendant shoot Scarborough. He stated that he did not know why he told defense counsel that he did not see the shooter, and testified that his testimony identifying defendant as the shooter was the truth. Dontez denied seeing anyone by the name of "Tiger" at the scene at the time of the shooting.

Dioneta, Dontez's brother, testified that he was sitting in the driver's side back seat of a vehicle in the parking lot of the apartment complex at approximately 10:30 p.m. while Scarborough was in the driver's seat. He testified that Hicks was in the front passenger seat. He further testified that he, Hicks, and Scarborough remained in the car for about two hours before a man nicknamed "Tiger," whose real name was Lafayette Hill, came to the car and asked Hicks to get out. Hicks then exited the car. About 45 minutes later, Dioneta heard gunshots and got onto the floor of the car. When the shooting stopped, he exited the car and heard Hicks say that Doughboy had been shot. Dioneta denied that people at the scene were screaming that defendant had shot Doughboy. He later testified, however, that the people at the scene did, in fact, say that defendant was the shooter. Dioneta denied ever telling anyone that defendant had shot Doughboy. On cross-examination, Dioneta testified that he did not see the shooter, but that he had seen Tiger with a gun at approximately 10:00 p.m. on the night of the shooting.

Sylvone Crosby testified that he had known defendant for a few years at the time of the shooting. On the night of the shooting, he was at the home of his aunt, Tonya Curtis, along with his friend, "Little D." He testified that Dioneta came to the house that night and told them that "Doughboy just got killed," but did not say who had killed him. The prosecutor then showed Crosby a written statement that he had given to the police on June 25, 2014. Crosby read the statement and acknowledged that, in the written statement, he stated that Dioneta had told him that defendant had shot Doughboy. When asked why he told the police that Dioneta had told him that defendant was the shooter, Crosby testified, "[b]ecause I had warrants and detective told me if I wrote it, he would let me go." Crosby again denied that Dioneta had ever told him that defendant was the shooter. Crosby testified that he lied to the police when he told them that he had heard that defendant was the shooter and when he told the police that he had often seen defendant with a gun in the past.

Defendant's mother, Khalilah Williams, was called by the prosecution and asked whether she had told the police that she had seen her son with a gun the day before the shooting. When she denied that she had done so, the prosecution questioned her regarding a statement she had given to the police on July 1, 2014. Williams acknowledged that the written statement indicated that she had seen defendant with a gun the day before the shooting and that defendant would shoot guns on occasion. She denied, however, that she had ever made such statements to the police. She testified that she had not been allowed to read the written statement before she signed it.

Detroit Police Officer Khary Mason, the officer in charge of the case, testified regarding a statement that defendant gave to him on August 19, 2014. Defendant told Officer Mason that, about two years before the shooting, defendant had shown Scarborough a firearm. When defendant asked for the weapon back, Scarborough "shot at him with it and said it's his now."

Defendant also told Officer Mason that there was an argument between Scarborough and Tiger on the evening of the shooting, that he saw Tiger with a gun, and that Tiger shot Scarborough. Mason also testified that Khalilah Williams reviewed her written statement before she signed it.

Defendant was convicted as described above. This appeal followed.

## II. DUE PROCESS

Defendant first argues that the trial court violated his right to due process of law when it coerced 16-year-old Dontez into identifying defendant as the shooter at trial by advising him regarding the crime of perjury or, in the alternative, that defense counsel's failure to object to the trial court's comments constituted ineffective assistance of counsel. We disagree. Because defendant did not object to the trial court's comments to Dontez, the propriety of the comments is reviewed for plain error that affected defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). With regard to his claim of ineffective assistance of counsel, we review for clear error the trial court's factual findings, while we review de novo its constitutional determinations. See *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Defendant moved this Court to remand for a new trial or an evidentiary hearing on his counsel's effectiveness, which this Court denied.[1] Our review of his claim for ineffective assistance of counsel is thus limited to errors apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

Both the Federal and Michigan Constitutions guarantee the right to due process of law. US Const, Am V; US Const, Am XIV; Const 1963, art 1, § 17; *People v Sierb*, 456 Mich 519, 523-524; 581 NW2d 219 (1998). A "fundamental element" of the right to due process is the right of a defendant to challenge prosecution witnesses and to present witnesses in his defense. *Webb v Texas*, 409 US 95, 98; 93 S Ct 351; 34 L Ed 2d 330 (1972), quoting *Washington v Texas*, 388 US 14, 19; 87 S Ct 1920; 18 L Ed 2d 1019 (1967). In *Webb*, the United States Supreme Court found that the trial court's "lengthy admonition on the dangers of perjury" directed at a defense witness, combined with the trial court's assumption that the victim would lie if he testified and its threat to ensure that the witness was prosecuted for perjury if he lied, "effectively drove that witness off the stand, and thus deprived the petitioner of due process of law . . . ." *Id*. at 97-98. However, as this Court noted in *People v Robbins*, 131 Mich App 429, 439; 346 NW2d 333 (1984), "where the extraordinary circumstances on which the *Webb* decision was based were not present, warnings to potential defense witnesses concerning self-incrimination or possible perjury charges have been held to be proper."

At the preliminary examination, Dontez testified that he saw defendant shooting into the driver's side of the car in which Scarborough was sitting, and that he saw a gun in defendant's hand. At trial, Dontez initially testified that he did not see defendant at the time of the shooting. The prosecutor then asked Dontez whether he remembered testifying under oath at the

---

[1] *People v Williams*, unpublished order of the Court of Appeals, issued December 11, 2015 (Docket No. 326093).

preliminary examination, and Dontez stated that he did, after which defense counsel requested a bench conference. After the bench conference, the judge excused the jury and advised Dontez as follows:

*COURT*: Young man, I want to advise you of your rights, all right.

First of all, you have been sworn to tell the truth on the stand. My understanding is there are at least three other statements that you've made under oath.

Now, if you lie under oath, in other words, you deliberately say something under oath that is not true, that's a criminal act in the State of Michigan, and I think the penalty is fourteen years in prison, is it not?

*PROSECUTOR*: It would be life in this case because the offense is a life offense, so it would be life.

*THE COURT*: Then it would be—so, do you understand what he just said? Because it's a life offense, it would be a life offense of prison?

How old are you?

*WITNESS*: I'm sixteen.

*COURT*: Pardon?

*WITNESS*: I'm sixteen.

*COURT*: All right. And I know you were incarcerated last night, right?

*WITNESS*: Yes.

*COURT*: Would you think of living the rest of your life in jail?

*WITNESS*: No.

*COURT*: All right. So, when you take an oath to tell the truth and you deliberately lie, you're placing yourself in jeopardy of committing perjury. I want you to know that.

*WITNESS*: Yes.

*COURT*: Do you have any questions?

*WITNESS*: No.

*COURT*: Counsel, are you satisfied?

*DEFENSE COUNSEL*: Yes, Your Honor.

-4-

*COURT*: All right. Let's bring the jury back in.

When the prosecutor resumed his questioning, Dontez testified that, when he looked in the direction of the shooting, he saw defendant firing shots into the car in which Scarborough was sitting. He further testified that, when he turned in the direction of the shooting, he saw a handgun in defendant's hand.

We find no error requiring reversal in the trial court's comments to Dontez. Defendant's reliance on *Webb* is misplaced. In *Webb*, the trial court told the defense witness that, if he lied on the stand, the judge would "personally see that your case goes to the grand jury and you will be indicted for perjury." *Webb*, 409 US at 96. Unlike the threatening comments in *Webb*, the trial court in this case merely explained that lying under oath was a criminal act and advised the witness of the penalty for perjury. Given the nature of the trial court's comments and the young age of the witness, we find no error in the comments. Further, because the trial court's comments were not improper, defense counsel's failure to object to the comments did not constitute ineffective assistance of counsel. *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000) ("Trial counsel is not required to advocate a meritless position.").

## III. ADMISSION OF PRIOR INCONSISTENT STATEMENTS

Defendant also argues that the trial court erred in admitting the prior inconsistent statements of Dioneta, Crosby, and Williams at trial. We disagree that the prior statements were improperly used at trial, and conclude that any error does not require reversal. Defendant did not preserve this issue for review by objecting at trial to the admission of the prior inconsistent statements on the basis that the statements were hearsay. Therefore, this issue is reviewed for plain error that affected defendant's substantial rights. *Carines*, 460 Mich at 763.

Prior unsworn statements of a witness are hearsay and are generally inadmissible as substantive evidence. *People v Jenkins*, 450 Mich 249, 261-262; 537 NW2d 828 (1995). Generally, however, "evidence of a prior inconsistent statement of [a] witness may be admitted to impeach [the] witness even though the statement tends directly to inculpate the defendant." *People v Kilbourn*, 454 Mich 677, 682; 563 NW2d 669 (1997). Our Supreme Court set forth an exception to this general rule in *People v Stanaway*, 446 Mich 643; 521 NW2d 557 (1994), where the Court held that "[a] prosecutor cannot use a statement that directly tends to inculpate the defendant under the guise of impeachment when there is no other testimony from the witness for which his credibility is relevant to the case." *Kilbourn*, 454 Mich at 682. In other words, as stated in *Stanaway*, "[a] prosecutor may not use an elicited denial as a springboard for introducing substantive evidence under the guise of rebutting the denial." *Stanaway*, 446 Mich at 693. Thus, under *Stanaway*, a "very narrow rule" exists where impeachment with a prior inconsistent statement "should be disallowed when (1) the substance of the statement purportedly used to impeach the credibility of the witness is relevant to the central issue of the case, and (2) there is no other testimony from the witness for which his credibility was relevant to the case." *Kilbourn*, 454 Mich at 683.

At trial, Dioneta denied ever telling Crosby that defendant was the shooter and testified that he did not see the shooter. Defendant contends that evidence of Dioneta's statement to the police identifying defendant as the shooter should not have been used at trial because it violated

the rule set forth in *Stanaway*. We find no error in the prosecutor's use of the prior statement. While the substance of the prior statement was relevant to the central issue in the case, i.e., the identity of the shooter, Dioneta, much like witness in *Kilbourn*, gave other relevant testimony for which his credibility was relevant to the case. *Kilbourn*, 454 Mich at 683-684. Dioneta was in the backseat of the car when Scarborough, sitting in the front seat, was shot. He gave testimony regarding the events that occurred before, during, and after the shooting. Further, as in *Kilbourn*, Dioneta's testimony was in conflict with the testimony of another witness (Dontez) in several respects, including the presence of a person named Tiger. *Id*. Finally, unlike the witness in *Stanaway*, Dioneta had direct knowledge of the incident in question. *Stanway*, 446 Mich at 692. Therefore, the prosecution did not merely elicit a denial from Dioneta in order to present substantive evidence that otherwise would have been inadmissible hearsay under the guise of impeachment. Because Dioneta's credibility was relevant with respect to other important testimony, the admission of the prior inconsistent statement to impeach his testimony did not violate *Stanaway*. *Id*.

Defendant also argues that a prior inconsistent statement of Crosby was improperly admitted at trial in violation of *Stanaway*. Crosby testified at trial that Dioneta did not tell him who shot Scarborough. At this point in Crosby's testimony, the prosecutor showed Crosby a written statement that he gave to the police after the shooting, in which Crosby stated that Dioneta told him that defendant had shot Scarborough. This statement is similar to the impeachment evidence found to be improper in *Stanaway*, 446 Mich at 692, as Crosby had no personal knowledge of the alleged incident. The substance of Crosby's prior statement was relevant to the central issue in the case, i.e., the identity of the shooter. However, Crosby's statement was unlike that of the witness in *Stanaway*, where "[w]hether the witness could be believed in general was only relevant with respect to whether that specific statement was made." *Id*. at 693. In addition to testifying that Dioneta never told him that defendant was the shooter, Crosby also testified that he lied to the police when he told them that he had seen defendant with a gun in the past. Thus, Crosby's credibility was also at issue with respect to that testimony. Because Crosby's credibility was relevant to testimony other than his testimony regarding Dioneta's statement that defendant was the shooter, the use of Crosby's prior statement for impeachment did not fit into the "very narrow" rule of *Stanaway*. *Kilbourn*, 454 Mich at 683.

Defendant next argues that the use of a prior statement to the police made by Williams, defendant's mother, violated *Stanaway*. We disagree. While Williams' testimony was at least arguably relevant to whether defendant was the shooter, in that it tended to show that he had access to a handgun the day before the shooting, it did not go to the "central issue" of the case. *Stanaway*, 446 Mich at 692. Additionally, even if Williams' statement was admitted in error, such error did not affect defendant's substantial rights. The prior statement did not directly inculpate defendant in the shooting, but only indicated that defendant may have had possession of a gun the day before the shooting. In fact, the prior statement indicated that defendant had borrowed the gun from someone the day before the shooting because someone had threatened him with a gun. Having reviewed the record, this Court is not convinced that the admission of

Williams' prior statement affected the outcome of the proceedings. *People v Borgne*, 483 Mich 178, 196-197; 768 NW2d 290 (2009), aff'd 485 Mich 868; 771 NW2d 745 (2009).[2]

Further, because we find no error requiring reversal in the admission of the challenged prior inconsistent statements, counsel was not ineffective for failing to object to the admission of these statements. *Snider*, 239 Mich App at 425.

Finally, defendant argues that he was denied the effective assistance of counsel because defense counsel failed to request the standard jury instruction limiting the use of the prior inconsistent statements to impeachment and prohibiting the use of the statements as substantive evidence. To establish a claim of ineffective assistance of counsel, a defendant must satisfy a two-part test set forth in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001). First, a defendant must show that counsel's performance was deficient. *Carbin*, 463 Mich at 600. "This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Id.*, quoting *Strickland*, 466 US at 687. Second, a defendant must also show that counsel's deficient performance prejudiced the defense. *Strickland*, 466 US at 687; *Carbin*, 463 Mich at 600. To demonstrate prejudice, a defendant must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Strickland*, 466 US at 694; *Carbin*, 463 Mich at 600.

A defendant seeking to demonstrate deficient performance by his counsel must "overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Trakhtenberg*, 493 Mich at 52. Here, we do think that defense counsel should have requested a limiting instruction on the use of prior inconsistent statements. Such an instruction indicates to the jury that it may not consider the prior inconsistent statements as substantive evidence of defendant's guilt, but only in considering a witness's credibility. See *People v Stanton*, 190 Mich App 558, 562; 476 NW2d 477 (1991). While defense counsel may have decided not to request the instruction to avoid drawing the jury's attention to the damaging statements, some of the statements at issue would have been prejudicial if used by the jury as substantive evidence rather than only for impeachment, most notably Dioneta's statement that multiple people at the scene were saying that defendant was the shooter. However, we conclude that defendant cannot demonstrate that he was prejudiced by his counsel's performance. In the first instance, although the prosecution made brief reference to Dioneta's statements in closing arguments, it did not encourage the jury to use the prior inconsistent statements as substantive evidence of the victim's guilt; rather, the statements were used as part of the prosecution's argument that Dioneta's testimony that he did not see the shooter was not believable. *Id.*, citing

---

[2] We note also that it is not entirely clear that Williams' prior statement was offered as impeachment evidence. Williams professed to a difficulty in remembering events in the past due to "seizures and memory loss," and after reading her statement testified consistently with that statement despite denying having written it. Thus, had the request been made, it is at least arguable that Williams' statement could have been admitted as a past recollection recorded. See MRE 803(5); *People v Chelmicki*, 305 Mich App 58, 64; 850 NW2d 612 (2014).

*People v Hodges*, 179 Mich App 629, 632; 446 NW2d 325 (1989) ("Where no request has been made for a limiting instruction on the use of prior inconsistent statements, the general rule is that relief will not be given when there is no demonstration or likelihood of prejudice and where neither the court nor the prosecutor suggested to the jury that prior inconsistent statements could be used as substantive evidence."). Further, in light of Dontez's testimony identifying defendant as the shooter, we conclude that defendant has not shown a reasonable probability that the result of the proceeding would have been different if not for defense counsel's errors. See *People v Steanhouse*, 313 Mich App 1, 14; ___ NW2d ___ (2015), lv gtd on other grounds 499 Mich 934 (2016).

Affirmed.


/s/ Kathleen Jansen
/s/ Karen M. Fort Hood
/s/ Mark T. Boonstra

-8-