# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ALPHONSO L. STRAUGHTER JR.,

        Defendant-Appellant.

UNPUBLISHED
April 11, 2017

No. 328956
Wayne Circuit Court
LC No. 15-000755-02-FC

---

Before: STEPHENS, P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his convictions following a jury trial for carjacking, MCL 750.529a, armed robbery, MCL 750.529, conspiracy to commit armed robbery, MCL 750.529 and MCL 750.157a, second-degree home invasion, MCL 750.110a(3), and unlawful imprisonment, MCL 750.349b. Defendant was sentenced to 16.5 to 25 years of imprisonment for his convictions of carjacking, armed robbery, and conspiracy to commit armed robbery and was sentenced to 15 to 25 years for his convictions of second-degree home invasion and unlawful imprisonment. Defendant appeals as of right raising various issues related to his conviction and sentence. We affirm defendant's convictions on all counts but remand to the trial court for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant was arrested and charged in connection with the robbery and carjacking of Arnold Gunther on the evening of January 2, 2015. According to the evidence, at the time of the robbery Gunther, who was nearly 70 years old, was in a relationship with Destiny Gerwatowski, who was 17 at the time.

Gerwatowski testified that earlier that day she and defendant, at the suggestion of her uncle and aunt, made plans to rob Gunther that evening.[1] Gerwatowski then made plans to spend the night with Gunther at his home in Southgate. Gunther picked Gerwatowski up from her

---

[1] Gerwatowski testified that at the time she would have considered herself to be in a dating relationship with defendant as well as with Gunther.

mother's place, and the two of them arrived at Gunther's home around 9:00 p.m. When they arrived at Gunther's house, Gerwatowski asked for his cell phone and car keys, which also contained his house alarm remote, and he gave them to her. Then, as Gunther walked to his house two men approached him from behind and one of the men held him while the other pointed a gun at his head. Gunther testified that the men then dragged him back into the garage, took his wallet, and frustrated at the lack of money in his wallet, forced him into the trunk of his car. Gunther testified that defendant was the man who grabbed him from behind and held him. Gerwatowski testified that defendant was the man who pointed the gun at Gunther. However, they both testified that after Gunther was placed in the trunk of his car, the other man, who was identified as "Jack," got in the driver's seat of the car and drove off while defendant and Gerwatowski followed in defendant's car.

Eventually, Gunther was able to use a cigarette lighter to find the trunk's internal release lever, and, while the car was stopped at a red light, he opened the trunk and escaped. Gunther testified that despite several attempts he was unable to get any drivers to stop, so he went to a nearby liquor store and called 911. Gerwatowski testified that "Jack," defendant, and herself then left Gunther's car in an alley and drove to a motel in Melvindale. Prior to going to the motel, Gerwatowski stated that they stopped at a Kroger in Dearborn so that defendant and "Jack" could convert change at a Coinstar. Gerwatowski testified that defendant gave her $119 from the Coinstar and the $90 they had taken from Gunther's wallet.

Officer William Campbell responded to Gunther's 911 call and, upon receiving a description of the attackers from Gunther, drove with Gunther to his house. Gunther and Campbell then found an open window and discovered that Gunther's bedroom was trashed and that loose change was missing. Gunther's vehicle was eventually located by Detroit police. Gerwatowski went to the police station the next morning where she eventually told officers about defendant's involvement as well as her own role in the robbery.[2] The next day, police prepared a photographic line up for Gunther that included defendant and five other randomly selected photographs. Gunther identified defendant's photograph from the lineup. The next day defendant was shown a second photographic lineup wherein he identified the individual referred to as "Jack" as the other man who attacked him that evening.

## II.    DEFENDANT'S CHALLENGES TO HIS CONVICTION

Defendant raises several issues that he claims merit reversal of his convictions. The first was raised in his brief submitted by appellate counsel, and the others were raised in defendant's Standard IV brief. Defendant is not entitled to relief on any of these grounds.

First, defendant alleges that the photographic lineup given to Gunther the day after the robbery was impermissibly suggestive and a violation of his constitutional due process rights.

---

[2] Gerwatowski received a plea deal in exchange for her testimony. While Gerwatowski had not yet been sentenced at the time of her testimony, she stated that her plea would reduce her sentence by six years and that she expected to serve a total of three years in prison.

The basis for defendant's claim is that of the five other individuals included in the photograph, two of them had a different hair style than himself and that he was included on the top row of the photographic lineup in between these two men, whereas the three men who had the same hairstyle as him were all placed on the bottom row. We find defendant's claim without merit. "In order to sustain a due process challenge, a defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993). "Physical differences among the lineup participants do not necessarily render the procedure defective and are significant only to the extent that they are apparent to the witness and substantially distinguish the defendant from the other lineup participants." *People v Hornsby*, 251 Mich App 462, 466; 650 NW2d 700 (2002). All of the other individuals in the photographic lineup were the same race and were similar in age, height, and weight as defendant. The minor physical difference between defendant and the two individuals whose photographs were on his left and right were not sufficient to render the lineup suggestive or constitutionally deficient.[3]

Additionally, there is no indication that the lineup procedure itself was in any way impermissibly suggestive. The police officer who procured the lineup, Sergeant Fobar, testified that a computer program randomly identified a sample of individuals for the lineup who matched defendant's age, height, weight, hair color, and eye color and that, while officers selected which 5 individuals to include in the lineup, based on the sample given by the computer, the computer also automated the order in which the photographs appeared. Therefore, we reject defendant's claim that the photographic lineup violated his constitutional right to due process.

Defendant next argues that the trial court reversibly erred in failing to sua sponte grant a mistrial after one of the jurors revealed on the second day of deliberations that she had felt verbally assaulted by other jurors during the first day. This juror was questioned by the trial court at the start of the second day and acknowledged that while she felt verbally assaulted the previous day due to the use of curse words, she felt better that morning. She stated that everyone was acting professional that morning. "[I]t is well established that not every instance of misconduct in a juror will require a new trial." *People v Nick*, 360 Mich 219, 230; 103 NW2d 435 (1960) (internal citation and quotations omitted). "[I]f [the alleged improper conduct] does not appear [to have been] occasioned by the prevailing party or by anyone in his behalf, and there is nothing to indicate any improper bias upon the juror's mind, and the court cannot see that it either had, or might have had, an effect unfavorable to the party moving for a new trial, the verdict ought not to be set aside." *Id.* (internal citations and quotations omitted).

Noticeably absent from defendant's argument on this issue is any indication that the alleged verbal assault or intimidation prejudiced him. There is no indication that the alleged verbal assault had anything to do with the juror suggesting a favorable verdict for defendant or even that it had something to do with that juror interpreting a piece of evidence in defendant's

---

[3] Furthermore, when Gunther described the two attackers to Officer Campbell he stated that both of the attackers were wearing caps.

favor. To the contrary, the record suggests that the juror felt intimidated or assaulted because curse words were used in the jury room. Additionally, the juror specifically stated that she did not feel intimidated on the start of the second day of deliberations. Defendant was not entitled to a mistrial on this basis.[4]

Defendant next argues that his trial counsel was constitutionally ineffective for failing to object to several pieces of evidence introduced by the prosecution and for failing to move to admit certain evidence that defendant alleges is exculpatory. In order to succeed on his ineffective assistance of counsel claim, defendant is required to "show that counsel's performance was deficient" and "that the deficient performance prejudiced" him. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Because no *Ginther*[5] hearing was held, "review is limited to mistakes apparent on the record." *People v Hurst*, 205 Mich App 634, 641; 517 NW2d 858 (1994).

Defendant first argues that his trial counsel was ineffective for failing to object to certain cell phone location exhibits introduced by Sergeant Fobar and to Fobar's testimony concerning those exhibits. Fobar was not certified as an expert witness. Therefore, his testimony "in the form of opinions and inferences" should have appropriately been "limited to those opinions or inferences which [were] (a) rationally based on the perception of [Fobar] and (b) helpful to a clear understanding of [his] testimony or the determination of a fact in issue." MRE 701.

Fobar's testimony concerned certain cell phone records for the phone number associated with the cell phone defendant had in his possession at the time he was arrested and information Fobar was able to deduce from those records. Fobar explained that these records provided him with the specific cell phone tower that initially routed each call that was made to or placed from that cell phone number as well as the specific longitude and latitude coordinates of that tower. Fobar then proceeded to testify concerning how he was able to deduce from the cell phone records that every cell tower is divided into three 120 degree sectors and how he was able to pinpoint which sector routed a specific call to or from the phone number associated with defendant. Through Fobar's testimony, the prosecution entered three exhibits each corresponding to a different phone call either made by or placed to the target phone number on the night of the robbery that purported to show that the phone associated with the target number had to be somewhere within a 120 degree angle emanating from the specific cell tower that routed the call. In testifying about the workings of cell phone tower technology and how such towers route calls based on 120 degree sectors, Fobar was providing more than simply lay opinion testimony but was instead providing "scientific, technical, or other specialized

---

[4] Defendant also argues that his trial counsel was ineffective for failing to move for a mistrial based on this issue. "Trial counsel is not required to advocate a meritless position." *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000). Because there is no merit to defendant's argument that the one juror's allegations of being verbally assaulted entitled defendant to a new trial, his argument that trial counsel was ineffective for failing to move for a mistrial is also without merit.

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

knowledge" that would have required Fobar be certified as an expert under MRE 702. Furthermore, when asked on cross examination about how far out each 120 degree angle on the prosecution's exhibits extended, Fobar answered "less than a mile-and-a-half to two miles." This answer is premised on the assumption that the applicable cell phone tower could not have routed a call to or from a cell phone more than a mile and a half to two miles away. Despite making this assumption, Fobar never provided any information as to its accuracy. Fobar's testimony and the exhibits introduced through it should have prompted an objection from defense counsel.

From our review of the record, it appears that the reason for defense counsel's failure to object to this evidence was his confusion about just what the evidence was able to show. At one point prior to trial, counsel acknowledged that it would be beneficial to have an expert appointed to help him understand this evidence, at another point, counsel suggested that the evidence would actually be exculpatory, and immediately before trial, counsel suggested that the evidence was so damaging that he would be unable to even try the case because of its presence. While the evidence was certainly not exculpatory, it was far from a smoking gun either.[6]

We agree with defendant that his trial counsel was ineffective for failing to investigate and learn about Fobar's cell phone location evidence and object to the admission of his testimony. A failure to investigate and consult experts and witnesses necessary to understanding the prosecution's allegations can constitute ineffective assistance of counsel. *People v Trakhtenberg*, 493 Mich 38, 52-54; 826 NW2d 136 (2012). However, we do not believe that the deficient performance demonstrates a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 US at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Even discounting Fobar's cell phone location testimony and corresponding exhibits, the evidence against defendant was quite strong. Gunther's and Gerwatowski's accounts of the events were similar in most respects, with the one notable difference being that they provided inconsistent accounts of whether defendant or "Jack" was the one holding Gunther while the other held the gun. Gerwatowski's account of events was also corroborated by independent evidence in several key respects. In addition to the cell phone records, Fobar obtained video footage of defendant at a Coinstar in a Kroger on the evening of the crime depicting him convert the same amount of change that Gerwatowski testified he converted. Additionally, the desk clerk at the motel where Gerwatowski testified she spent the night with defendant and "Jack" recalled

---

[6] Additionally, at several times on the record, defense counsel refers to Fobar's cell phone evidence as "triangulation." This was incorrect. Triangulation is a process by which a cell phone's location is approximated using multiple cell phone towers. See *In re Pen Register & Trap/Trace Device with Cell Site Location Authority*, 396 F Supp 2d 747, 751 (SD Tex, 2005); and see Handler, *An Island of Chaos Surrounded by a Sea of Confusion: The E911 Wireless Device Location Initiative*, 10 Va J L & Tech 1, 17 n 42 (2005). Fobar's testimony attempted to approximate the location of the cell phone using only one cell phone tower.

defendant checking in. Defendant's girlfriend, Laura Alcoser, also testified to seeing both defendant and "Jack" that evening during the same time that Gerwatowski testified the two of them had left the motel. Given the strength of this evidence, it is highly unlikely that the jury would have reached a different outcome even if Fobar had not been permitted to present the cell phone location evidence.

Next defendant alleges that his trial counsel was ineffective for failing to further impeach Gunther and Gerwatowski concerning alleged inconsistencies in their testimony with other evidence presented at trial. However, in each instance, we either find that no inconsistency existed or that trial counsel had valid strategic reasons for failing to pursue the inconsistency in the manner defendant suggests on appeal. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.' " *Harrington v Richter*, 562 US 86, 109; 131 S Ct 770; 178 L Ed 2d 624 (2011), quoting *Yarborough v Gentry*, 540 US 1, 8; 124 S Ct 1; 157 L Ed 1 (2003). The reviewing court must make every effort "to eliminate the distorting effects of hindsight" when reviewing a presumptively sound trial strategy, *Strickland*, 466 US at 689, including being mindful that no expectation should exist "that competent counsel will be a flawless strategist or tactician." *Harrington*, 562 US at 110. "[A]n attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id*.

Defendant first argues that his trial counsel was ineffective for failing to impeach Gunther regarding his description of defendant's height. Gunther testified that defendant was the shorter of the two people who attacked him and that his attackers were around 5'8" and 5'10" tall. In reality, defendant is 6'1" and "Jack" is 6' tall. However, counsel had a valid strategic reason for failing to further impeach Gunther on this discrepancy. As was evident from Gunther's and Gerwatowski's individual accounts of the events that evening, the two differed in their recollection of who held Gunther and who pointed the gun at him. Assuming that Gunther was inaccurate in his recollection that the shorter of the two attackers held him while the taller pointed the gun at him, drawing attention to this discrepancy would have also resulted in corroborating Gerwatowski's recollection of events. Defense counsel's closing statement makes clear that a key part of his strategy was to cast Gerwatowski as untruthful and an opportunist who would lie to help her own predicament. Therefore, it was reasonable for trial counsel to avoid impeaching Gunther further on this discrepancy.

Defendant also argues that his trial counsel was ineffective for failing to highlight an alleged inconsistency regarding Gunther's 911 call with the call Fobar testified he used in making his cell phone location exhibits, discussed above. Gunther's 911 call was made at 9:50 p.m. The call Fobar used in making his exhibits was made at 8:51 p.m. Defendant alleges that the timing of these two phone calls is contrary to other testimony that suggested the robbery and carjacking lasted only a few minutes. We disagree. The fact that the phone call used in Fobar's exhibit was made at 8:51 p.m. in no way indicates that the robbery began around that time. Additionally, the fact that the 911 call was made at 9:50 p.m. does not mean that that was the time Gunther escaped the trunk of the vehicle. Gunther testified that he first attempted to waive down cars to get people to help him before proceeding to the liquor store. Because these phone calls are not inconsistent with other evidence, trial counsel was not ineffective for failing to suggest that they were.

-6-

Defendant also argues that trial counsel was ineffective for failing to argue that Gunther's testimony that his home alarm system was not sounding when he and Officer Campbell arrived there later that evening was inconsistent with the prosecution's claim that defendant's had entered the house. However, Gerwatowski and Gunther both testified that Gunther had given his keys with the house alarm remote to Gerwatowski prior to the robbery. Gunther also testified that it was a few minutes after he was placed in the trunk of his car before the vehicle began to move. Therefore, it is certainly possible that defendant had time to enter Gunther's home before leaving the residence.

Finally, defendant argues that his trial counsel was ineffective for failing to introduce a letter Gerwatowski allegedly wrote him prior to testifying at trial. While this letter does have certain statements that could be viewed in isolation as suggesting defendant was not an active perpetrator in the crime, when read in its entirety the letter appears to be a response to a previous letter defendant had written concerning a possible allegation that "Jack" had threatened him, a plea to defendant to not testify against "Jack," and an apology to defendant for what Gerwatowski planned to say at trial. Additionally, the letter contained several statements that could be seen as bolstering Gerwatowski's testimony. Defense counsel likely realized that any attempt to use this letter to impeach Gerwatowski would have ultimately been of little success and may have led to rebuttal arguments that could have further damaged defendant's case.[7]

---

[7] The full text of the letter reads:

Okay so,

I've been thinking and I don't know what you've said to your lawyer or in court already but stop saying anything. Remember the letter you wrote me about Jack threatening you, you and I both know that they've read it and probably made copies by now. Baby, you know that's not what happen [sic] just as well as I do. You don't know what happen [sic] because you weren't there. But just be honest and tell them what we really saw. I already told them that I told you about Buzz's money and that I wanted it for Christmas. I know I'm going to get in some type of trouble. Just promise me you'll be waiting for me no matter what! You and I both know that they have nothing on yall [sic] except whatever I say and what Buzz says he saw yall [sic]. Your [sic] going to find out everything at court about what I said so I'll just say sorry now. It could be worse. I could've just let you go down and say fuck it. But I realized I can't do it, my mom was going to let me too. Nobody knows how I feel but you. And I love you to death so. You know they're going to read and probably copy this letter too. But I had to stop you from turning on Jack baby. You and I both know that he was there when we seen Buzz hop out when you picked me up. I have to let the truth out. At least I know that yall will be straight and not going down for something you didn't do. I love you.

Forgive me? please.

Destiny Gerwatowski

Defendant's convictions on all counts are affirmed.

### III. DEFENDANT'S SENTENCING CHALLENGES

Defendant first alleges that he was improperly scored 50 points for OV 7. OV 7 is properly scored at 50 points when "[a] victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). In determining whether OV 7 is properly scored at 50 points, a court may consider "circumstances inherently present in the crime." *People v Hardy*, 494 Mich 430, 443; 835 NW2d 340 (2013). "The relevant inquiries are (1) whether the defendant engaged in conduct beyond the minimum required to commit the offense; and, if so, (2) whether the conduct was intended to make a victim's fear or anxiety great by a considerable amount." *Id.* at 443-444.

Placing Gunther in the trunk of the car and driving off was more than the minimum conduct required to commit the scored offenses because the offenses of armed robbery, conspiracy to commit armed robbery, carjacking, and second-degree home invasion could have been completed without the need to remove defendant from his residence after their completion. See MCL 750.529, MCL 750.529a, and MCL 750.110a(3). Additionally, the crime of unlawful imprisonment could have been accomplished by restraining defendant at his residence to facilitate the offenders flight, MCL 750.349b(1)(c); it was not necessary to place Gunther in the confined place of the car trunk and drive off with him. Placing Gunther in the trunk of the car and driving off with him is also conduct intended to make a victim's fear or anxiety great by a considerable amount. While the actions of restraining Gunther, pointing a gun at him, and taking his wallet would certainly have caused him to believe that further violence against him was possible, actually placing him in the trunk of the car would have undoubtedly caused him to believe that further violence or even death was likely. The trial court did not err in scoring defendant 50 points for OV 7.[8]

Defendant next argues that he was improperly sentenced as a habitual offender because the prosecutor failed to comply with the requirements of the habitual offender statute. That statute states:

> (1) In a criminal action, the prosecuting attorney may seek to enhance the sentence of the defendant as provided under section 10, 11, or 12 of this chapter,[]

---

I totally wouldn't blame you if you never wanted to talk to me again. (But all I can do is hope that's not the case.)

[8] Defendant also argues that the scoring of OV 7 was not justified because Gerwatowski testified that it was "Jack" and not defendant who placed Gunther in the trunk of the car. Defendant is correct that OV 7 is only properly scored if the defendant's "actual participation" reflects acts listed in the variable. *People v Hunt*, 290 Mich App 317, 325-326; 810 NW2d 588 (2010). However, Gunther testified that both defendant and his accomplice placed him in the trunk. The trial court's decision to believe Gunther's testimony in this regard over Gerwatowski's was a factual determination that was not clearly erroneous. See *Hardy*, 494 Mich at 438.

by filing a written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense.

(2) A notice of intent to seek an enhanced sentence filed under subsection (1) shall list the prior conviction or convictions that will or may be relied upon for purposes of sentence enhancement. The notice shall be filed with the court and served upon the defendant or his or her attorney within the time provided in section (1). The notice may be personally served upon the defendant or his or her attorney at the arraignment on the information charging the underlying offense, or may be served in the manner provided by law or court rule for service of written pleadings. The prosecuting attorney shall file a written proof of service with the clerk of the court. [MCL 769.13.]

The language of the statute explicitly requires that the prosecutor file the habitual offender notice with the court and serve the notice upon defendant. See *id.* While the statute allows the notice to "be personally served upon the defendant or his or her attorney at the arraignment on the information," it also specifically states that "[t]he prosecuting attorney shall file a written proof of service with the clerk of the court." MCL 769.13(2).

In the present case, there is a Felony Information in the record dated January 23, 2015[9] that states defendant is being charged as a second degree habitual offender. However, there is no written proof of service in the circuit court file as is required by MCL 769.13(2).

The Supreme Court has been clear that where the prosecution has "not proven that the notice of sentence enhancement was served on defendant within 21 days after the defendant was arraigned" defendant's sentence as a habitual offender is to be vacated, and he is to be remanded for resentencing without habitual offender enhancement. *People v Cobley*, 463 Mich 893; 618 NW2d 768 (2000). The Supreme Court's order in *Cobley* expressly reversed our decision that a failure to comply with the statute's proof of service requirement did not compel reversal if the defendant had actual notice of the habitual offender filing before trial. *People v Cobley*, unpublished opinion per curiam of the Court of Appeals issued April 20, 1999 (Docket No. 204155), p 1-2, reversed by *Cobley*, 463 Mich at 893. In a later case, *People v Muhammad*, unpublished opinion per curiam of the Court of Appeals issued July 29, 2014 (Docket No. 317054), we concluded that the prosecution's failure to serve notice was harmless error because the record reflected that defendant had actual notice of the habitual offender notice. Again the Supreme Court reversed. *People v Muha*mmad, 498 Mich 909; ___ NW2d ___ (2015).[10] See

---

[9] That is the date on the Information. There is no filing stamp on it so the date of filing cannot be determined.

[10] In any event, after reviewing the transcripts and lower court record, we cannot locate any evidence that actual notice was provided, and the prosecution did not respond to defendant's Standard IV brief in which this issue was raised.

also, *In re Bail Bond Forfeiture*, 496 Mich 320; 852 NW2d 747 (2014) (stating that "[w]hen a statute provides that a public officer 'shall' undertake some action within a specified period of time, and that period of time is provided to safeguard another's rights . . . it is mandatory that such action be undertaken within the specified period of time" and stating that "noncompliant public officers are prohibited from proceeding as if they had complied with the statute"). Therefore, we vacate defendant's sentence as a habitual offender and remand to the trial court for resentencing without habitual enhancement.

Defendant also argues that his sentence violates the Supreme Court's decision in *People v Lockridge*, 498 Mich 358, 392-393; 870 NW2d 502 (2015), because his sentence was calculated using a guidelines minimum range in which OVs were scored on the basis of facts not admitted by him or found beyond a reasonable doubt by the jury and that he was not given a proper opportunity to allocute at his second sentencing hearing.[11] Because we are remanding to the trial court for resentencing, we need not address these issues other than to remind the trial court of the advisory nature of the sentencing guidelines under *Lockridge*, 498 Mich 364-365 and that it must make sure defendant has the opportunity to allocute at resentencing, *People v Petit*, 466 Mich 624, 628; 648 NW2d 193 (2002).[12]

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro

---

[11]Defendant acknowledges that he had an opportunity to allocute at his initial sentencing hearing. However, due to an error that occurred at that hearing, defendant had a second sentencing hearing, where he argues he was not given the chance to allocute.

[12] The Supreme Court has stated that, while a trial court need not specifically ask a defendant if he wishes to allocute, the better practice is "to specifically ask the defendant if he has anything to say on his own behalf before sentencing." *Petit*, 466 Mich 628-630, 630 n 6.