# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
November 7, 2017

v

HILERY NOEL MAISON,

        Defendant-Appellant.

No. 332162
St. Clair Circuit Court
LC No. 15-001515-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANDREW WILLIAM MAISON,

        Defendant-Appellant.

No. 332164
St. Clair Circuit Court
LC No. 15-001516-FC

---

Before: SERVITTO, P.J., and JANSEN and STEPHENS, JJ.

PER CURIAM.

In these consolidated cases, defendants appeal as of right their jury trial convictions of felony murder, MCL 750.316(1)(b), two counts of torture, MCL 750.85, and two counts of first degree child abuse, MCL 750.136b(2). The trial court sentenced both defendants to life imprisonment on each charge, with the felony murder charges to be served without the possibility of parole. We affirm in both cases.

Defendants, husband and wife, were charged with and convicted of torture, first-degree child abuse, and felony-murder with respect to the husband's five-year-old daughter from a prior relationship and of torture and first-degree child abuse with respect to the husband's three-year-old daughter from a prior relationship. Essentially, both girls were deprived of food, water and medical attention, and suffered from malnutrition and dehydration which, in the five-year old's case, also led to severe pneumonia and caused her death. Two other children in the household, the wife's 10-yeard-old son from a prior relationship, and the parties' eighteen-month-old child together, were healthy and unharmed.

-1-

On appeal, both defendants first assert that there was insufficient evidence presented at their joint trial to convict them of any of the charges. We disagree.

We review de novo claims concerning insufficiency of the evidence. *People v Osby*, 291 Mich App 412, 415; 804 NW2d 903 (2011). In doing so, we must view the evidence in the light most favorable to the prosecution to "determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *People v Alter*, 255 Mich App 194, 201–202; 659 NW2d 667 (2003).

Felony murder is:

(b) Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, kidnapping, vulnerable adult abuse in the first or second degree under section 145n, torture under section 85, aggravated stalking under section 411i, or unlawful imprisonment under section 349b. [MCL 750.316(1)(b)].

The elements of first-degree felony murder are: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b), here first degree child abuse]." *People v Smith*, 478 Mich 292, 318–19; 733 NW2d 351 (2007)(citation omitted).

Felony murder is essentially second-degree murder with the added element that the murder occurred during the commission of an enumerated felony – first-degree child abuse is one such felony. *People v Maynor*, 256 Mich App 238, 243-244; 662 NW2d 468 (2003). Thus, the prosecution must prove each element of second-degree murder beyond a reasonable doubt and then must also prove each element of first-degree child abuse beyond a reasonable doubt.

There is no question that the five-year-old child, Mackenzie, died. The first element of felony murder, the killing of a human being, has thus been established. The evidence also establishes the second element; specifically that Mackenzie was killed with the intent "to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice]." *Smith*. 478 Mich at 319. Notably, first degree felony murder does not require a specific intent to kill. Rather, it requires a showing of malice. "A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999)(citation omitted). "It is for the jury to determine whether the element of malice can be inferred from all the evidence." *People v Flowers*, 191 Mich App 169, 176–177; 477 NW2d 473 (1991). Although proof of death by starvation, standing alone, is insufficient to infer the element of malice, starvation (or other omissions) coupled with evidence of the appropriate intent, may rise to the level of murder. *People v Giddings*, 169 Mich App 631, 634; 426 NW2d 732 (1988).

Daniel Spitz, a forensic pathologist and the chief medical examiner for St. Clair and Macomb Counties, conducted an autopsy on Mackenzie. He testified that the cause of

Mackenzie's death was dehydration and malnutrition, complicated by pneumonia and related sequelae due to neglect, and that the manner of death was homicide. Dr. Spitz further elaborated that the degree to which Mackenzie was dehydrated and malnourished indicated that these conditions had been going on for more than just a couple of weeks. Spitz testified that Mackenzie was neglected in that she was not being given the basic needs to thrive and that her pneumonia developed as a consequence of her debilitated state.

Dr. Marcus Degraw, a pediatrician and child abuse specialist at St. John Hospital in Detroit, testified that children are very different from adults in that they cannot make a decision to purposely go on a hunger strike. He testified that although children may be picky eaters, their hunger drive overcomes everything so that if food is available, they will eat, even if food is in the garbage. He further testified that when she died, Mackenzie had an obvious and significant infection (pneumonia), a blood stream infection, extraordinarily severe malnutrition and dehydration, and that fighting an infection becomes significantly more difficult if one is malnourished. Even Dr. Mark Shuman, defendant's expert witness, testified that Mackenzie was undernourished and that it was chronic, though he disputed whether her undernourished state led to pneumonia.

Nearly all persons who came in contact with Mackenzie on the night of her death testified to her being noticeably gaunt. For example, Andrew Teichow of the Port Huron Police Department testified to Mackenzie being extremely thin with her bones sticking out and Doctor Bradley Coloia, an emergency room physician at Lake Huron Medical Center, testified that she was small, emaciated, and appeared malnourished.

Even if defendants had not intended to kill Mackenzie when they failed to provide her with sufficient food, water, and appropriate medical attention, the extreme extent of her malnourishment and injuries established that the lack of basic necessities was neither accidental nor done without malice. Defendants set in motion a force likely to cause great bodily harm to Mackenzie. At the very least, defendants were aware of Mackenzie's painfully thin body and her medical needs and did nothing to address these clearly obvious conditions. Viewing the facts in a light most favorable to the prosecution, a jury could have easily inferred malice in these circumstances.

The third element of felony murder requires that killing occur while defendants were (in this case) committing, attempting to commit, or assisting in the commission of first degree child abuse. *Smith*, 478 Mich 319. One is guilty of first degree child abuse if that person "knowingly or intentionally causes serious physical or serious mental harm to a child." MCL 750.136b(2). The statute defines serious physical harm as "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." MCL 750.136b(1)(f). Since Mackenzie died of dehydration and malnutrition, complicated by pneumonia related sequelae due to neglect, and further presented with an extraordinary amount of bruises all over her body, the injuries she suffered plainly meet the definition of serious physical harm.

With respect to whether defendants knowingly or intentionally caused serious physical or serious mental harm to Mackenzie, it is significant that Mackenzie was suffering from

pneumonia, severe malnourishment, and severe irritation in her vaginal and anal area that was bloody at the time of her death, yet defendants did not seek medical treatment for her. According to both paramedics responding to the home, Mackenzie's vaginal area was red, inflamed, and, according to one, "a dried bloody mess." All who saw her described her appearance as emaciated, extremely thin and gaunt, or variations thereof, and medical records clearly established that Mackenzie had been losing weight in the two years prior to her death. Defendants' expert testified that Mackenzie was neglected and malnourished. And, both Dr. Spitz and the emergency room doctor who attended Mackenzie testified that she had likely been dead for a while before defendants called 911. These facts are significant because first-degree child abuse does not require an affirmative act and may be committed by an omission.

The second degree child abuse statutes, MCL 750.136b(3)(b) and (c), both require that the defendant "knowingly or intentionally commits an act." MCL 750.136b(2), on the other hand requires only that the defendant "knowingly or intentionally causes serious physical or serious mental harm to a child." The Legislature's failure to use the term "act" in the first-degree child abuse statute indicates that first-degree child abuse can be committed by an omission. "Omission" is defined in the child abuse statutes as "a willful failure to provide food, clothing, or shelter necessary for a child's welfare or willful abandonment of a child." MCL 750.136b(1)(c). Mackenzie's obviously emaciated state and lack of medical attention allows for an inference that defendants willfully failed to provide food and care necessary for her welfare.

In *People v Portellos*, 298 Mich App 431, 434–435; 827 NW2d 725 (2012) overruled on other grounds by *People v Calloway*, 500 Mich 180; 895 NW2d 165 (2017), the defendant was convicted of second-degree murder and first-degree child abuse relating to the death of her newborn child. In concluding that there was sufficient evidence to support the jury's verdicts, this Court stated:

> Portellos was trained in first aid, CPR, and sudden infant death syndrome. Portellos knew she was pregnant for a few weeks. She hid her pregnancy from her mother and told witnesses that she was afraid that her mother would find out about the pregnancy. Portellos read books on labor and delivery and decided to give birth to her baby at home, unassisted. Portellos had a cellular phone. Even after determining that the baby was being born breech, Portellos did not call for assistance. However, Portellos had the presence of mind to call her supervisor and coworkers to explain her absence at work. And, even after the baby did not cry when she was born, but only gasped a little and did not move, Portellos still did not call for medical assistance. She instead wrapped the baby tightly in a towel. Portellos then placed the baby in a garbage bag. [Id. at 444–445.]

This Court concluded:

> On the basis of the facts in this case, a reasonable juror could conclude that Portellos intentionally smothered Baby Portellos so that Mary Portellos would not hear the baby cry. A reasonable juror could alternatively conclude that the baby died (1) because Portellos failed to summon medical assistance, (2) from being wrapped tightly in a towel, or (3) from being placed in the garbage bag. A reasonable juror could infer from these facts that Portellos knew that the natural

-4-

and probable consequence of those actions included death or serious injury to Baby Portellos. We conclude that sufficient evidence supports Portellos's convictions of first-degree child abuse and second-degree murder because a reasonable juror could find that Portellos intentionally took actions that caused the baby's death or knowingly took those actions with a wanton disregard of the risks. [Id. at 445–446.]

This Court, then, found that the failure to call for medical assistance, with knowledge that serious harm would result, was sufficient to satisfy the requirements of the first-degree child abuse statute.

The above case supports the conclusion that the failure to act to prevent harm to a child (i.e., failing to call for medical assistance) with knowledge that serious physical harm will result satisfies the requirements of the first-degree child abuse statute. Defendants' failure to seek medical attention when Mackenzie was losing weight or failing to gain weight, failing to seek medical attention when she had pneumonia and a severe inflammation of her genital area, and failing to call 911 immediately upon noting that she was becoming unresponsive all support a conviction for first degree child abuse as to Mackenzie. That being so, the third element of felony murder has been satisfied. Moreover, the evidence was sufficient to support the convictions for first degree child abuse of Mackenzie.

The evidence was also sufficient to support defendants' convictions of torture with respect to Mackenzie. The statute proscribing torture, MCL 750.85(1), provides:

A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.

"Cruel" is defined in the torture statute as "brutal, inhuman, sadistic, or that which torments." MCL 750.85(2)(a). "Great bodily injury" is defined as either:

(*i*) Serious impairment of a body function as that term is defined in section 58c of the Michigan vehicle code, 1949 PA 300, MCL 257.58c.

(*ii*) One or more of the following conditions: internal injury, poisoning, serious burns or scalding, severe cuts, or multiple puncture wounds. [MCL 750.85(2)(c)]

The statute further defines "custody or physical control" as "the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority." Thus, the crime of torture contains the following elements: (1) the defendant had custody or physical control over the victim, (2) the defendant exercised custody or physical control over the victim without her consent or without lawful authority to do so, (3) at the time the defendant had custody or physical control over the victim, he intentionally caused great bodily injury and/or severe mental pain or suffering to the victim, and (4) the defendant intended to cause the victim to suffer cruel or extreme physical pain or mental pain and suffering. M Crim JI 17.36.

Both defendants assert that there was no evidence that they intended to cause cruel or

extreme physical or mental pain and suffering to Mackenzie. Because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented. *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). Here, a jury could infer the intent to cause extreme physical or mental pain and suffering from the extent of Mackenzie's malnourishment. According to Dr. Spitz, the malnourishment was chronic and had to have occurred over a period of more than a couple of weeks. This opinion was echoed by other medical professionals. Withholding of food to the point where the child was on the brink of death satisfies the definition of both extreme physical suffering and mental suffering.

In addition, the significant amount of bruises on Mackenzie's body, coupled with her genital injury, which medical professionals described as bloody and opined would have been painful and obvious, constitute circumstantial evidence of defendants' intent to cause extreme physical and/or mental pain and suffering to Mackenzie. Defendants' denial of any knowledge of a bathroom issue or genital injury when the dried blood and injury was immediately obvious to emergency personnel and officers responding to the home indicates defendants' state of mind with respect to Mackenzie and their intent to cause her harm.

Defendant Andrew Maison also argues that the evidence was insufficient to show the "custody or physical control" element of the torture charge. MCL 750.85(1). According to defendant, a custodial parent has a well-recognized "lawful authority" to forcibly restrict his minor child's movements and to forcibly confine his minor child. We find defendant's argument unavailing.

While one would not argue that a parent lacks the right to put a child in a time-out or similarly restrain a child's movement as a means of punishment, defendant has provided no authority suggesting that all restriction of any kind by a parent is lawful. It is common sense that any forcible restriction used by a parent must be only that which is reasonably necessary. The significant bruising on Mackenzie, the withholding of food from her, the allowance of a serious case of pneumonia to proceed untreated and the allowance of a significant ulceration of her genital region without medical treatment cannot be deemed either reasonably necessary or to fall within the definition contemplated by "lawful authority." The jury could reasonably infer from the evidence that defendant exercised custody or physical control over Mackenzie without lawful authority to do so. There was thus sufficient evidence to convict both him and Hilery Maison of torture concerning Mackenzie.

Defendants also appeal their convictions of first degree child abuse and torture with respect to three-year-old Makayla. As previously indicated, one is guilty of first degree child abuse if that person "knowingly or intentionally causes serious physical or serious mental harm to a child." MCL 750.136b(2). Serious physical harm is "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." MCL 750.136b(1)(f).

When officers arrived at the home in response to a call regarding Mackenzie, they found Makayla in a state of lethargy and presenting as what they described as emaciated. Officers testified that she had low energy with very tight skin, her head was much larger than her body,

-6-

her face was sunken, she had a hard time standing due to her thin state, and she appeared to be in pain when one of the Officers picked her up. Makayla asked for water and when Officers got her some, she drank 4-5 glasses of water in a span of 15 minutes. She was taken to Children's Hospital and was admitted in the early stages of shock due to malnutrition and dehydration.

Dr. Nazer, a child abuse pediatrician at Children's Hospital of Michigan, testified that she obtained Makayla's full medical records and performed a full medical exam of her on just a few days after she was removed from defendants' home. Dr. Nazer immediately noticed that Makayla was very thin and when undressed, her ribs and bones protruded. Makayla's stomach was distended, her skin was dry, she had very little fat, and her buttocks and cheeks had a wrinkled appearance due to lack of fat. She was unsteady in walking and was weak. At 3 ½ years old, Makayla was, according to Dr. Nazer, the weight of an eight month old baby and the height of an 18 month-old child. Based on her weight and presentation, Makalya was not able to thrive, was severely malnourished, and was neglected. Dr. Nazer performed medical testing when she first met with Makayla and there was no medical reason for her to have weighed so little. Dr. Nazer evaluated Makayla's medical records several months after her first evaluation of her and noted that since that time, her weight has increased.

Dr. Marcus Degraw, a pediatrician and child abuse specialist at St. John Hospital in Detroit, similarly testified that Makayla lacked medical care and suffered severe malnutrition for an extended period of time. Dr. DeGraw testified that children who are "picky" eaters have preferences, not ultimatums, and noted that Makayla's alleged pickiness "magically" disappeared when she was with other people and given normal dietary intake. Her weight increased significantly within several months after removal from defendants' care with no medications and no indications of pickiness. Indeed, Julie Bartos, Makayla's first foster mother, testified that Makayla ate anything that was put in front of her. During the time Makayla lived with her, she went from being extremely frail and being barely able to stand up to being able to move around more. Makayla gradually gained weight while in Julie's care.

In sum, after she was removed from the home, Makayla spent several days at Children's Hospital due to malnutrition and extreme dehydration. She was in the early stages of shock. By all accounts, she was weak, frail, and barely able to move. Expert testimony established that at 3 ½, Makayla would not have refused food and liquids to the point where she would become so malnourished and dehydrated. A 3 ½ year-old needs to have sufficient food provided to her as she cannot provide for herself. Also by all accounts, after she was placed in a home other than defendants' she ate everything put in front of her, was not a picky eater and steadily gained weight. The circumstantial evidence and inferences arising therefrom were sufficient to permit a jury to find that defendants deliberately withheld food and liquid from Makayla. Defendants' causing Makayla to be on the brink of death due to malnourishment and dehydration and to be so emaciated that her weight was that of an 8 month old baby easily meets the statutory definition of physical harm found in the child abuse statute. The evidence was thus sufficient to find that that defendants knowingly or intentionally caused serious physical or serious mental harm to Makayla (MCL 750.136b(2)) and thus to find them guilty of first degree child abuse.

The same testimony supports defendants' convictions of torture as to Makayla. The crime of torture contains the following elements: (1) the defendant had custody or physical control over the victim, (2) the defendant exercised custody or physical control over the victim

without her consent or without lawful authority to do so, (3) at the time the defendant had custody or physical control over the victim, he intentionally caused great bodily injury and/or severe mental pain or suffering to the victim, and (4) the defendant intended to cause the victim to suffer cruel or extreme physical pain or mental pain and suffering. M Crim JI 17.36.

Defendants clearly had custody or physical control over 3 ½ year-old Makayla. She was too young to give consent to this custody or physical control and, as discussed regarding Mackenzie, any "lawful authority" concerning restraint of one's child had to be within reason. The withholding of food and liquid to the point of emaciation and the requirement of medical treatment is not and cannot be deemed to be a reasonable exercise of a parent's lawful authority to restrain one's child. Concerning element (3), above, the testimony of all witnesses concerning Makayla supports a finding that defendants intentionally caused great bodily injury to Makayla. Indeed, there was no exculpatory testimony or evidence concerning Makayla and nothing to refute the evidence that she was deprived or denied food consistently over a long period of time.

Defendants' intent to cause Makayla to suffer cruel or extreme physical pain or mental pain and suffering can be inferred from minimal circumstantial evidence. *Kanaan*, 278 Mich App 622. Here, a jury could infer the intent to cause extreme physical or mental pain and suffering from the extent of Makayla's malnourishment. To all those who saw her, Makayla was visibly emaciated, weighing only as much as an 8 month old baby. She had difficulty walking and even standing due to her lack of food and water. A father and stepmother who would withhold food and then watch as a 3 ½ year-old slowly wasted away while not seeking medical help or giving the child to someone else to care for could easily be seen to have intentionally caused the child's suffering. There was more than sufficient evidence to convict defendants of torture as it relates to Makayla.

Next, defendant Hilery Maison claims she was denied the effective assistance of counsel for a variety of reasons, none of which we find to have merit. Because she did not move the trial court for a new trial or for a Ginther[1] hearing, we review her unpreserved claim of ineffective assistance of counsel for errors apparent on the record below. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

In order to obtain a new trial based on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. *People v Trakhtenberg*, 493 Mich 38, 51–52; 826 NW2d 136 (2012). The defendant must overcome the presumption that the challenged action was sound trial strategy. *People v Carrick*, 220 Mich App 17, 22; 558 NW2d 242 (1996). "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). To overcome the presumption of sound trial strategy, defendant must show that counsel's alleged error may have made a difference in the outcome by, for example, depriving defendant of a substantial defense. See *Flowers*, 222 Mich App at 737.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

"A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments." *People v Grant*, 470 Mich 477, 486–87; 684 NW2d 686 (2004). Counsel must make an independent examination of the facts, circumstances, pleadings and laws involved and pursue all leads relevant to the merits of the case. *Id*. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation . . . . [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 485. The failure to reasonably investigate can constitute ineffective assistance of counsel. *Trakhtenberg*, 493 Mich at 52–53. Counsel may also provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant. *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). However, trial counsel is not required to advocate a meritless position. See *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000).

Hilery Maison contends that trial counsel was ineffective in failing to call her 10-year-old son, Ethan, who was in the home on the night Mackenzie died, as a witness. She points out several statements Ethan made to police that she believes would have been beneficial to her at trial (e.g., Mackenzie was not a good eater, defendant fought with her because she would not eat, punishments were removal of tv and spankings). However, Hilery Maison's stepfather testified that when they lived with him, he saw that Mackenzie was a picky eater and if she didn't like something she would not eat it. Andrew Maison's grandmother also testified that Hilery was very loving toward the kids, that Mackenzie was not a big eater and was a picky eater and that Hilery used time outs as a form of discipline. Thus, the testimony concerning Mackenzie not being a good eater and discipline not involving the withholding of food was entered through other witnesses. More importantly, Ethan was only at the home Mondays through Wednesdays and there were several other statements that Ethan made to the police that could have been potentially harmful to defendant at trial. For example, Ethan told police his parent's hid things and asked whether he would get in trouble if something bad was found at the house. He also stated that when Mackenzie "passed out" the evening of death his parents were "slapping her face to wake her up like they usually do." Thus, defense counsel likely made a strategic decision not to call Ethan as a witness. Hilery Maison has not established that a different outcome would likely have occurred had Ethan been called as a witness and counsel was thus not ineffective for failing to doing so.

Hilery Maison also asserts that counsel was ineffective for failing to properly cross-examine Dr. Nazer about Makayla's height. Hilery contends that cross-examining Dr. Nazer about Makayla's height would have established that Makayla was at a healthy body mass index (BMI) for her height when Dr. Nazer assessed her. However, Dr. Nazer's testimony was not that Makayla was at an unhealthy BMI for her height. Her testimony was that Makayla was chronically malnourished, losing weight from 2014 on and that this chronic malnourishment affected her height, i.e., stunted her growth. Moreover, Dr. Nazer testified several times that Makayla's height was that of an 18 month old and her weight that of an 8 month old, which gave the jury an idea of her height and that it was still a significant disparity from that which it should have been. Defendant has not overcome the presumption that defense counsel chose not to cross-examine Dr. Nazer concerning Makayla's specific height as a matter of strategy, because counsel believed it would not have made a difference.

Hilery Maison next contends that trial counsel was ineffective because he failed to cross-examine and impeach Dr. Spitz on the methodology he used in gauging Mackenzie's weight, had she not been dehydrated, at the time of her death. Dr. Spitz testified that dehydration is going to affect body weight and, when asked on cross-examination whether there was a scientific formula for calculating the amount of water deficit based on one's serum sodium level, he responded:

> . . . you get it corrected, you know, like a volume deficit then I suppose you can, a liter of fluids, 2.2 pounds, you can do a corrected weight assuming the child's at normal hydration.

Dr. Spitz testified that he did not add back in water weight with respect to Mackenzie to asses her weight because it would be negligible as far as changing the percentile on the weight charts in which she was located. According to Dr. Spitz, the charts only go down to the third percentile and Mackenzie was below the third percentile in weight, weighing 25 pounds, and at the third percentile in height, being 3 foot 3 inches tall.

Defendants' expert, Dr. Mark Shuman, testified that that in order to determine Mackenzie's actual weight at the time of her death, one would need to calculate how much her water deficit was due to dehydration. He testified that there was a simple formula based on sodium levels. In Mackenzie's case he calculated that she was about 2 liters deficient of water, or approximately 4.5 pounds. Adding the 4.5 pounds to Mackenzie's 25 weighed pounds and calculating her BMI, Dr. Shuman testified that she would be around the 5th percentile. He testified that this was "low" and is considered by the Center for Disease Control to be underweight and a condition that would require medical attention.

Notably, Dr. Spitz did not testify that one could not or should not add back in water weight lost through dehydration at the rate of 2.2 pounds per liter. He also did not testify as to any particular method for doing so. And, the 4.4 pounds that defendants' expert testified should have been added to Mackenzie's weight could reasonably be construed as "negligible" given that it boosted Mackenzie only from the 3rd to 5th percentile. She was still, by both experts' opinions, underweight and requiring medical attention due to malnourishment. Defense counsel testified as to what Hilery Maison thought was the "proper" methodology for bringing Mackenzie back to her pre-dehydration weight through her expert. Counsel was thus not ineffective for failing to cross-examine Dr. Spitz on his methodology (or lack thereof).

Hilery Maison next claims that counsel was ineffective for failing to investigate or cross-examine the experts as to lead poisoning being a possible explanation for Makayla and Mackenzie's conditions. However, the only support for a potential investigation into lead poisoning provided by Hilery is two progress notes from Lighthouse Family Medicine. The first one, dated May 7, 2013, is a well child visit for Makayla, wherein it is noted that she has a personal history of exposure to lead and states that a lab test will be done to test for lead levels. The next note, dated June 17, 2015, repeats the personal history of exposure to lead, with an indication that lead levels will be checked.

A June 17, 2015, blood test for Makayla shows no presence of lead. And, the 18-month-old child of defendants lived in the same home as Mackenzie and Makayla and was apparently healthy and of normal weight and size. Defendant has provided no evidence that either

Mackenzie or Makayla did, in fact, suffer from lead poisoning. Given the evidence, defendant has not established that had counsel pursued lead poisoning the outcome of her case would have been different.

Hilery Maison lastly asserts that counsel was ineffective for failing to move for a *Daubert*[2] hearing to determine the correct scientific analysis for starvation and the correct procedure to determine weight in that analysis. MRE 702 "requires trial judges to act as gatekeepers who must exclude unreliable expert testimony." *Lenawee Co v Wagley*, 301 Mich App 134, 162; 836 NW2d 193 (2013). The purpose of a *Daubert* hearing is to filter out unreliable expert evidence. *Id*.

> While *Daubert* hearings are required when dealing with expert *scientific* opinions in an effort to ensure the reliability of the foundation for the opinion, "where non-scientific expert testimony is involved, 'the [*Daubert*] factors may be pertinent,' or 'the relevant reliability concerns may focus upon personal knowledge or experience.' " *Surles v Greyhound Lines, Inc.*, 474 F 3d 288, 295 (CA 6, 2007) (citations omitted). "The gatekeeping inquiry is context-specific and 'must be tied to the factors of a particular case.' " *Id*. [*Lenawee Co*, 301 Mich App at 163, internal citation omitted].

The essential issues in this matter were whether defendants *intentionally* malnourished the girls and whether Mackenzie's cause of death was malnutrition and dehydration complicated by pneumonia and related sequela due to neglect as opined by Dr. Spitz, or pneumonia and infection as opined by Dr. Shuman. All testimony, including that of defendant's expert, was that Mackenzie and Makayla were malnourished and required medical attention. At 3 ½ and 5 they clearly could not provide nourishment for themselves. A *Daubert* hearing would have no bearing on defendants' intent with respect to whether the malnourishment was intentional or merely neglectful.

A *Daubert* hearing would also have no bearing on the cause of death. Again, all parties agreed that the girls were malnourished. Further Dr. Spitz testified that he reached his conclusion as to cause of death based not simply on Mackenzie's weight, but also on objective observation of her appearance and looking at the laboratory results. Notably, he did not testify or conclude that Mackenzie simply starved to death, as stated by the defendant. Rather, she was neglected by being chronically malnourished, which weakened her state and allowed for pneumonia and other issues to take hold and kill her. Dr. Shuman's difference of opinion was that she was not malnourished enough to allow for the pneumonia to occur as a result and that the pneumonia and infection simply occurred, as it sometimes does in children. And, he was the only one to give an opinion concerning whether Mackenzie was "starving." A scientific opinion as to starvation was not given by Dr. Spitz. Counsel was thus not ineffective for failing to failing to request a *Daubert* hearing.

---

[2] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Andrew Maison asserts that his counsel was also ineffective due to counsel's failure to request a specific jury instruction on causation and where he failed to request a jury instruction on the necessarily lesser included offense of involuntary manslaughter. We disagree.

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Rodriguez*, 463 Mich 466, 473; 620 NW2d 13 (2000). "Jury instructions must therefore include all the elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence." *People v Fennell*, 260 Mich App 261, 265; 677 NW2d 66 (2004). A defense attorney's decision to not request a particular jury instruction can be a matter of trial strategy, and defense counsel has wide discretion on matters of trial strategy. *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013).

Andrew Maison argues that because his theory was that Mackenzie's pneumonia and resulting death was not caused by malnutrition, defense counsel should have requested a causation instruction as it relates to homicide. M Crim JI 16.15 provides:

> [There may be more than one cause of death.] It is not enough that the defendant's act made it possible for the death to occur. In order to find that the death of [*name deceased*] was caused by the defendant, you must find beyond a reasonable doubt that the death was the natural or necessary result of the defendant's act.

Here, defendant's felony-murder conviction required proof beyond a reasonable doubt that Mackenzie's death was directly caused by defendant's actions in failing to provide her with nutrition and hydration. Dr. Spitz testified that the cause of Mackenzie's death was dehydration and malnutrition, complicated by pneumonia and related sequela due to neglect and the manner of death was classified as a homicide. Dr. Spitz further testified that kids don't just get pneumonia and that the degree of dehydration and malnutrition suffered by Mackenzie had been going on for a period of time — not just over a few days or even a couple of weeks.

Defendant's expert, Dr. Shuman, on the other hand, testified that the cause of Mackenzie's death was pneumonia and infection and he does not believe that malnourishment caused or contributed to Mackenzie's pneumonia. While Shuman agreed that Mackenzie was undernourished and that it was chronic, he specifically opined that he did not believe that she was malnourished enough to make her susceptible to pneumonia.

Thus, defense counsel chose to pursue a theory, through expert Dr. Shuman, that Mackenzie's cause of death was acute pneumonia and rhinovirus — *not* malnutrition and dehydration as opined by Dr. Spitz. If successful, such a defense strategy would have resulted in an acquittal. "The decision to proceed with an all or nothing defense is a legitimate trial strategy." *People v Nickson*, 120 Mich App 681, 687; 327 NW2d 333 (1982). The fact that this strategy ultimately failed does not indicate that defense counsel was ineffective. *People v Kevorkian*, 248 Mich App 373, 414–415; 639 NW2d 291 (2001).

Moreover, to prove causation in a criminal case, the defendant's conduct must be both the factual cause and the proximate cause of the result. *People v Schaefer*, 473 Mich 418, 435; 703

NW2d 774 (2005). Factual causation is established if the result would not have occurred "but for" the defendant's conduct. *Id*. at 435–436. Proximate cause is established if the victim's injury is a "direct and natural result" of the defendant's conduct. *Id*. at 436. Proximate causation is a legal construct "designed to prevent criminal liability from attaching when the result of the defendant's conduct is viewed as too remote or unnatural." *Id*. However, if there was an intervening cause that superseded the defendant's conduct, then the causal link between the defendant's conduct and the victim's injury is broken, and the defendant's conduct is not deemed to be the proximate cause. *Id*. at 436–437. An intervening cause supersedes a defendant's conduct as the proximate cause if it was not reasonably foreseeable. *People v Feezel*, 486 Mich 184, 195; 783 NW2d 67 (2010).

Again, Dr. Spitz testified that Mackenzie was chronically malnourished and that malnutrition and dehydration were the cause of her death. Dr. Shuman agreed that Mackenzie was malnourished. He also testified that her body mass, when calculated based on proper fluid in her body, and her height were low enough that the CDC would consider her as requiring medical attention. Shuman testified that in his opinion, Mackenzie's parents did not seek medical attention for her when they should have. Tellingly, when asked about the manner of death, Shuman testified that he is "leaning towards it being natural." He testified that he has a very high threshold to call it homicide by neglect and that he needs more investigative information. In light of Dr. Shuman's testimony, even if the jury believed that defendants had something to do with the decedent's emaciated and dehydrated condition but that pneumonia ultimately caused her death, they could still have found that her death was the natural or necessary result defendants' actions in allowing Mackenzie's medical needs to go unmet (their "neglect").

Concerning the failure to request a jury instruction on involuntary manslaughter, involuntary manslaughter is a necessarily included lesser offense of murder. *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003). Therefore, where a criminal defendant is charged with murder, the trial court should provide an instruction on involuntary manslaughter if it is supported by a rational view of the evidence. *People v McMullan*, 488 Mich 922; 789 NW2d 857 (2010). An offense is clearly supported when substantial evidence to support it exists. *People v Silver*, 466 Mich 386, 388 n 2; 646 NW2d 150 (2002).

"Involuntary manslaughter is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty." *Mendoza*, 468 Mich at 536. Because the only element separating first degree murder from involuntary manslaughter is malice, a thorough understanding of "malice" is necessary. "The facts and circumstances of the killing may give rise to an inference of malice. A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Carines*, 460 Mich at 759. A prosecutor can prove malice "[e]ven absent concrete proof of a particular act causing death [.]" *People v Nelson*, 493 Mich 933; 825 NW2d 581 (2013). Intent to do great bodily harm is "an intent to do serious injury of an aggravated nature." See *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (quotation marks and citation omitted). The intent to do great bodily harm can be inferred from minimal circumstantial evidence and reasonable inferences drawn therefrom." *People v Guthrie*, 262 Mich App 416, 419; 686 NW2d 767 (2004). "It is for the trier of fact, not the appellate court, to determine what inferences may be

fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Id.*

Here, the overwhelming evidence was that Mackenzie was chronically malnourished and that a young child such as herself would not be such a picky eater as to put herself in this state. There was no evidence presented that Mackenzie suffered from any condition or illness that would cause chronic malnourishment. All circumstantial evidence points towards the intentional withholding of food from Mackenzie which resulted in at least an obviously emaciated condition. Defendant's own expert merely "leaned toward" a natural cause of death, explaining that he has a very high threshold to call it homicide by neglect and that he needs more investigative information. Again, malice includes the intent to great bodily harm and the intent to do great bodily harm can be inferred from minimal circumstantial evidence and reasonable inferences drawn therefrom. *Guthrie*, 262 Mich App at 419. Any rational view of the evidence supports only those instructions that require malice. No substantial evidence to support an instruction on involuntary manslaughter exists. Trial counsel was thus not ineffective for failing to request such an instruction.

Affirmed.


/s/ Deborah A. Servitto
/s/ Kathleen Jansen
/s/ Cynthia Diane Stephens